TENET ET AL. *v.* DOE ET UX.

No. 03–1395.   Argued January 11, 2005—Decided March 2, 2005

2

Rehnquist, C. J., delivered the opinion for a unanimous Court. Stevens, J., filed a concurring opinion, in which Ginsburg, J., joined, *post*, p. 11.   Scalia, J., filed a concurring opinion, *post*, p. 12.

*Acting Solicitor General Clement* argued the cause for petitioners.   With him on the briefs were *Assistant Attorney General Keisler, Deputy Assistant Attorney General*

*Katsas, Lisa S. Blatt, Barbara L. Herwig,* and *H. Thomas Byron III.*

*David J. Burman* argued the cause for respondents. With him on the brief were *Steven W. Hale, Elizabeth A. Alaniz,* and *Marie Aglion.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In *Totten* v. *United States,* 92 U. S. 105 (1876), we held that public policy forbade a self-styled Civil War spy from suing the United States to enforce its obligations under their secret espionage agreement. Respondents here, alleged former Cold War spies, filed suit against the United States and the Director of the Central Intelligence Agency (CIA), asserting estoppel and due process claims for the CIA's alleged failure to provide respondents with the assistance it had promised in return for their espionage services. Finding that *Totten* did not bar respondents' suit, the District Court and the Court of Appeals for the Ninth Circuit held that the case could proceed. We reverse because this holding contravenes the longstanding rule, announced more than a century ago in *Totten,* prohibiting suits against the Government based on covert espionage agreements.

Respondents, a husband and wife who use the fictitious names John and Jane Doe, brought suit in the United States District Court for the Western District of Washington.[1] According to respondents, they were formerly citizens of a foreign country that at the time was considered to be an enemy of the United States, and John Doe was a high-ranking diplomat for the country. After respondents expressed interest in defecting to the United States, CIA agents persuaded them to remain at their posts and conduct espionage for the

_____

[1] The Government has neither confirmed nor denied any of respondents' allegations. We therefore describe the facts as asserted in respondents' second amended complaint. See App. to Pet. for Cert. 128a–136a. They are, of course, no more than allegations.

4

United States for a specified period of time, promising in return that the Government "would arrange for travel to the United States and ensure financial and personal security for life." App. to Pet. for Cert. 122a. After "carrying out their end of the bargain" by completing years of purportedly high-risk, valuable espionage services, *id.*, at 123a, respondents defected (under new names and false backgrounds) and became United States citizens, with the Government's help. The CIA designated respondents with "PL–110" status and began providing financial assistance and personal security.[2]

With the CIA's help, respondent John Doe obtained employment in the State of Washington. As his salary increased, the CIA decreased his living stipend until, at some point, he agreed to a discontinuation of benefits while he was working. Years later, in 1997, John Doe was laid off after a corporate merger. Because John Doe was unable to find new employment as a result of CIA restrictions on the type

---

[2] While the Government neither confirms nor denies that respondents are part of any "PL–110" program, the parties agree this reference is to 50 U. S. C. § 403h, a provision enacted as part of the Central Intelligence Agency Act of 1949, § 8, 63 Stat. 212 (renumbered § 7, 72 Stat. 337). This provision allows a limited number of aliens and members of their immediate families per year to be admitted to the United States for permanent residence, regardless of their admissibility under the immigration laws, upon a determination by the Director of the CIA, the Attorney General, and the Commissioner of Immigration that admission of the particular alien "is in the interest of national security or essential to the furtherance of the national intelligence mission." § 403h. However, nothing in this statute, nor anything in the redacted CIA regulations and related materials respondents cite, see Brief for Respondents 41–43; App. to Brief in Opposition 41–50, represents an enforceable legal commitment by the CIA to provide support to spies that may be admitted into the United States under § 403h. See also App. to Pet. for Cert. 145a (decl. of William McNair ¶ 5 (Information Review Officer for the CIA's Directorate of Operations) (stating, based on his search of regulations and internal CIA policies, that he "can inform the court unequivocally that there are *no* Agency or other US federal regulations that require the CIA to provide lifetime subsistence assistance to individuals brought into the United States under the authority of PL–110" (emphasis in original))).

of jobs he could hold, respondents contacted the CIA for financial assistance.[3] Denied such assistance by the CIA, they claim they are unable to properly provide for themselves. Thus, they are faced with the prospect of either returning to their home country (where they say they face extreme sanctions), or remaining in the United States in their present circumstances.

Respondents assert, among other things, that the CIA violated their procedural and substantive due process rights by denying them support and by failing to provide them with a fair internal process for reviewing their claims. They seek injunctive relief ordering the CIA to resume monthly financial support pending further agency review. They also request a declaratory judgment stating that the CIA failed to provide a constitutionally adequate review process, and detailing the minimal process the agency must provide. Finally, respondents seek a mandamus order requiring the CIA to adopt agency procedures, to give them fair review, and to provide them with security and financial assistance.

The Government moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), principally on the ground that *Totten* bars respondents' suit. The District Court dismissed some of respondents' claims but denied the Government's *Totten* objection, ruling that the due process claims could proceed. 99 F. Supp. 2d 1284, 1289–1294 (WD Wash. 2000). After minimal discovery, the Gov-

---

[3] Respondents document their alleged series of contacts with the CIA. See *id.*, at 128a–136a (Second Amended Complaint). For instance, respondents allegedly received a letter from the CIA in June 1997, expressing regret that the agency no longer had funds available to provide assistance. *Id.*, at 128a. Later, respondents claim they were told the agency determined "the benefits previously provided were adequate for the services rendered." *Id.*, at 129a. Although the CIA apparently did not disclose to respondents the agency's appeals process, respondents were permitted to appeal the initial determination both to the Director of the CIA and to a panel of former agency officials called the Helms Panel; both appeals were denied. *Id.*, at 129a–132a.

ernment renewed its motion to dismiss based on *Totten,* and it moved for summary judgment on respondents' due process claims. Apparently construing the complaint as also raising an estoppel claim, the District Court denied the Government's motions, ruled again that *Totten* did not bar respondents' claims, and found there were genuine issues of material fact warranting a trial on respondents' due process and estoppel claims. App. to Pet. for Cert. 85a–94a. The District Court certified an order for interlocutory appeal and stayed further proceedings pending appeal. *Id.,* at 79a–83a.

A divided panel of the Court of Appeals for the Ninth Circuit affirmed in relevant part. 329 F. 3d 1135 (2003). It reasoned that *Totten* posed no bar to reviewing some of respondents' claims and thus that the case could proceed to trial, subject to the Government's asserting the evidentiary state secrets privilege and the District Court's resolving that issue. 329 F. 3d, at 1145–1155. Over dissent, the Court of Appeals denied a petition for rehearing en banc. 353 F. 3d 1141 (CA9 2004). The Government sought review, and we granted certiorari.[4] 542 U. S. 936 (2004).

---

[4] Preliminarily, we must address whether *Steel Co.* v. *Citizens for Better Environment,* 523 U. S. 83 (1998), prevents us from resolving this case based on the *Totten* issue. In *Steel Co.,* we adhered to the requirement that a court address questions pertaining to its or a lower court's jurisdiction before proceeding to the merits. 523 U. S., at 94–95. In the lower courts, in addition to relying on *Totten,* the Government argued that the Tucker Act, 28 U. S. C. § 1491(a)(1), required that respondents' claims be brought in the Court of Federal Claims, rather than in the District Court. The District Court and the Court of Appeals rejected this argument, and the Government did not seek review on this question in its petition for certiorari. Pet. for Cert. 8, n. 2.

We may assume for purposes of argument that this Tucker Act question is the kind of jurisdictional issue that *Steel Co.* directs must be resolved before addressing the merits of a claim. Cf. *United States* v. *Mitchell,* 463 U. S. 206, 212, 215 (1983) (holding that "the Tucker Act effects a waiver of sovereign immunity" and observing that "the existence of consent [to be sued] is a prerequisite for jurisdiction"). Nevertheless, application of the *Totten* rule of dismissal, like the abstention doctrine of *Younger* v.

In *Totten*, the administrator of William A. Lloyd's estate brought suit against the United States to recover compensation for services that Lloyd allegedly rendered as a spy during the Civil War. 92 U. S. 105. Lloyd purportedly entered into a contract with President Lincoln in July 1861 to spy behind Confederate lines on troop placement and fort plans, for which he was to be paid $200 a month. *Id.*, at 105–106. The lower court had found that Lloyd performed on the contract but did not receive full compensation. *Id.*, at 106. After concluding with "no difficulty," *ibid.*, that the President had the authority to bind the United States to contracts with secret agents, we observed that the very essence of the alleged contract between Lloyd and the Government was that it was secret, and had to remain so:

> "The service stipulated by the contract was a secret service; the information sought was to be obtained clandestinely, and was to be communicated privately; the employment and the service were to be equally concealed. Both employer and agent must have understood that the lips of the other were to be for ever sealed respecting the relation of either to the matter. This

---

*Harris*, 401 U. S. 37 (1971), or the prudential standing doctrine, represents the sort of "threshold question" we have recognized may be resolved before addressing jurisdiction. See *Ruhrgas AG* v. *Marathon Oil Co.*, 526 U. S. 574, 585 (1999) ("It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits"); see also *Kowalski* v. *Tesmer*, 543 U. S. 125, 129 (2004) (assuming Article III standing in order to "address the alternative threshold question whether" attorneys had third-party standing); *Steel Co., supra*, at 100, n. 3 (approving a decision resolving *Younger* abstention before addressing subject-matter jurisdiction). It would be inconsistent with the unique and categorical nature of the *Totten* bar—a rule designed not merely to defeat the asserted claims, but to preclude judicial inquiry—to first allow discovery or other proceedings in order to resolve the jurisdictional question. Thus, whether or not the Government was permitted to waive the Tucker Act question, we may dismiss respondents' cause of action on the ground that it is barred by *Totten*.

condition of the engagement was implied from the nature of the employment, and is implied in all secret employments of the government in time of war, or upon matters affecting our foreign relations, where a disclosure of the service might compromise or embarrass our government in its public duties, or endanger the person or injure the character of the agent." *Ibid.*

Thus, we thought it entirely incompatible with the nature of such a contract that a former spy could bring suit to enforce it. *Id.*, at 106–107.

We think the Court of Appeals was quite wrong in holding that *Totten* does not require dismissal of respondents' claims. That court, and respondents here, reasoned first that *Totten* developed merely a contract rule, prohibiting breach-of-contract claims seeking to enforce the terms of espionage agreements but not barring claims based on due process or estoppel theories. In fact, *Totten* was not so limited: "[P]ublic policy forbids the maintenance of *any suit* in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential." *Id.*, at 107 (emphasis added); see also *ibid.* ("The secrecy which such contracts impose precludes *any action* for their enforcement" (emphasis added)). No matter the clothing in which alleged spies dress their claims, *Totten* precludes judicial review in cases such as respondents' where success depends upon the existence of their secret espionage relationship with the Government.

Relying mainly on *United States* v. *Reynolds*, 345 U. S. 1 (1953), the Court of Appeals also claimed that *Totten* has been recast simply as an early expression of the evidentiary "state secrets" privilege, rather than a categorical bar to their claims. *Reynolds* involved a wrongful-death action brought under the Federal Tort Claims Act, 28 U. S. C. § 1346, by the widows of three civilians who died in the crash of a military B–29 aircraft. 345 U. S., at 2–3. In the course of discovery, the plaintiffs sought certain investigation-

related documents, which the Government said contained "'highly secret,'" privileged military information. *Id.*, at 3–4. We recognized "the privilege against revealing military secrets, a privilege which is well established in the law of evidence," *id.*, at 6–7, and we set out a balancing approach for courts to apply in resolving Government claims of privilege, *id.*, at 7–11. We ultimately concluded that the Government was entitled to the privilege in that case. *Id.*, at 10–12.

When invoking the "well established" state secrets privilege, we indeed looked to *Totten.* *Reynolds, supra*, at 7, n. 11 (citing *Totten, supra*, at 107). See also Brief for United States in *United States* v. *Reynolds*, O. T. 1952, No. 21, pp. 36, 42 (citing *Totten* in support of a military secrets privilege). But that in no way signaled our retreat from *Totten*'s broader holding that lawsuits premised on alleged espionage agreements are altogether forbidden. Indeed, our opinion in *Reynolds* refutes this very suggestion: Citing *Totten* as a case "where the very subject matter of the action, a contract to perform espionage, was a matter of state secret," we declared that such a case was to be "dismissed *on the pleadings without ever reaching the question of evidence*, since it was so obvious that the action should never prevail over the privilege." 345 U. S., at 11, n. 26 (emphasis added).

In a later case, we again credited the more sweeping holding in *Totten*, thus confirming its continued validity. See *Weinberger* v. *Catholic Action of Haw./Peace Ed. Project*, 454 U. S. 139, 146–147 (1981) (citing *Totten* in holding that "whether or not the Navy has complied with [§ 102(2)(C) of the National Environmental Policy Act of 1969, 83 Stat. 853, 42 U. S. C. § 4332(2)(C)] 'to the fullest extent possible' is beyond judicial scrutiny in this case," where, "[d]ue to national security reasons," the Navy could "neither admit nor deny" the fact that was central to the suit, *i. e.*, "that it propose[d] to store nuclear weapons" at a facility). *Reynolds* therefore cannot plausibly be read to have replaced the categorical

*Totten* bar with the balancing of the state secrets evidentiary privilege in the distinct class of cases that depend upon clandestine spy relationships.

Nor does *Webster* v. *Doe*, 486 U. S. 592 (1988), support respondents' claim. There, we held that § 102(c) of the National Security Act of 1947, 61 Stat. 498, 50 U. S. C. § 403(c), may not be read to exclude judicial review of the constitutional claims made by a former CIA employee for alleged discrimination. 486 U. S., at 603. In reaching that conclusion, we noted the "'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Ibid.* But there is an obvious difference, for purposes of *Totten,* between a suit brought by an acknowledged (though covert) employee of the CIA and one filed by an alleged former spy. Only in the latter scenario is *Totten*'s core concern implicated: preventing the existence of the plaintiff's relationship with the Government from being revealed.[5] That is why the CIA regularly entertains Title VII claims concerning the hiring and promotion of its employees, as we noted in *Webster, supra,* at 604, yet *Totten* has long barred suits such as respondents'.

There is, in short, no basis for respondents' and the Court of Appeals' view that the *Totten* bar has been reduced to an example of the state secrets privilege. In a far closer case than this, we observed that if the "precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court

---

[5] The Court of Appeals apparently believed that the plaintiff's relationship with the CIA *was* secret in *Webster,* just as in this case. See 329 F. 3d 1135, 1153 (CA9 2003). It is true that the plaintiff in *Webster* proceeded under a pseudonym because "his status as a CIA employee cannot be publicly acknowledged." Brief for United States in *Webster* v. *Doe,* O. T. 1987, No. 86–1294, p. 3, n. 1. But the fact that the plaintiff in *Webster* kept his *identity* secret did not mean that the employment *relationship* between him and the CIA was not known and admitted by the CIA.

of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 484 (1989).

We adhere to *Totten.* The state secrets privilege and the more frequent use of *in camera* judicial proceedings simply cannot provide the absolute protection we found necessary in enunciating the *Totten* rule. The possibility that a suit may proceed and an espionage relationship may be revealed, if the state secrets privilege is found not to apply, is unacceptable: "Even a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to 'close up like a clam.'" *CIA* v. *Sims*, 471 U. S. 159, 175 (1985). Forcing the Government to litigate these claims would also make it vulnerable to "graymail," *i. e.*, individual lawsuits brought to induce the CIA to settle a case (or prevent its filing) out of fear that any effort to litigate the action would reveal classified information that may undermine ongoing covert operations. And requiring the Government to invoke the privilege on a case-by-case basis risks the perception that it is either confirming or denying relationships with individual plaintiffs.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, concurring.

In *Totten* v. *United States*, 92 U. S. 105 (1876), the Court held that an alleged oral agreement between a deceased spy and President Lincoln was unenforceable. There may be situations in which the national interest would be well served by a rule that permitted similar commitments made by less senior officers to be enforced in court, subject to procedures designed to protect sensitive information. If that be so, Congress can modify the federal common-law rule announced in *Totten*. For the purposes of today's decision,

which I join, the doctrine of *stare decisis* provides a sufficient justification for concluding that the complaint is without merit. The Court wisely decides that the absence of an enforceable agreement requires that respondents' constitutional and other claims be dismissed without first answering an arguably antecedent jurisdictional question. See *ante*, at 6–7, n. 4; see also *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 117–123 (1998) (STEVENS, J., concurring in judgment).

JUSTICE SCALIA, concurring.

I join the Court's opinion because I do not agree with JUSTICE STEVENS's concurrence, painting today's action as a vindication of his opinion concurring in the judgment in *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 112 (1998), in which he would have held that a jurisdictional bar does not prevent the resolution of a merits issue. When today's opinion refers to the issue in *Totten* v. *United States*, 92 U. S. 105 (1876), as "the sort of 'threshold question' we have recognized may be resolved before addressing jurisdiction," *ante*, at 7, n. 4, it is surely not referring to the run-of-the-mill, nonthreshold *merits* question whether a cause of action exists. And when it describes "the unique and categorical nature of the *Totten* bar—a rule designed not merely to defeat the asserted claims, but to preclude judicial inquiry," *ibid.*, it is assuredly not describing the mere everyday absence of a cause of action. As applied today, the bar of *Totten* is a jurisdictional one.

Of course even if it were not, given the squarely applicable precedent of *Totten*, the absence of a cause of action is so clear that respondents' claims are frivolous—establishing another *jurisdictional* ground for dismissal that the *Steel Co.* majority opinion acknowledges. See 523 U. S., at 89.