OneSimpleLoan v. U.S. Secretary of Education

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: June 26, 2007                           Decided: July 19, 2007)

Docket Nos. 06-2770-cv(L), 06-2994-cv(CON), 06-3770-cv(CON)

ONESIMPLELOAN, CARINA D. BALL, NATHAN BAZYK,

*Plaintiffs-Appellants*,

v.

U.S. SECRETARY OF EDUCATION, SECRETARY'S REGIONAL REPRESENTATIVE FOR REGION II,

*Defendants-Appellees.*

Before: WINTER, CABRANES, and RAGGI, *Circuit Judges.*

Plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*) dismissing their claims that enactment of the Deficit Reduction Act of 2005 violated the Bicameralism and Presentment Clause and the Appropriations Clause of the United States Constitution. The statute is unconstitutional, plaintiffs allege, because the House of Representatives passed a version of the bill that was not identical to the version passed by the Senate. We conclude that the "enrolled bill rule" requires us to treat as unimpeachable the text of the bill authenticated by the presiding officers of the House and Senate before being presented to the President. We also conclude that a court may dismiss a claim on the basis of this rule before assessing a plaintiff's standing.

Affirmed.

JOHN J. WITMEYER III (Matthew C. Ferlazzo, Jon R. Grabowski, *on the brief*), Ford Marrin Esposito Witmeyer & Gleser LLP, New York, NY, *for Plaintiffs-Appellants*.

ROBERT WILLIAM YALEN, Assistant United States Attorney (Michael J. Garcia, United States Attorney, Kathy S. Marks, Assistant United States Attorney, *on the brief*), United States Attorney's Office for the Southern District of New York, New York, NY, *for Defendants-Appellees*.

Allison M. Zieve, Adina H. Rosenbaum, Brian Wolfman, Public Citizen Litigation Group, Washington, DC, *for Amicus Public Citizen in Support of Plaintiffs-Appellants*.

Steven A. Hitov, Jane Perkins, National Health Law Program, Washington, DC, *for Amici Representatives Henry A. Waxman, Nancy Pelosi, John D. Dingell, Charles B. Rangel, Pete Stark, George Miller, James L. Oberstar, Louise McIntosh Slaughter, Sherrod Brown, Bennie G. Thompson in Support of Plaintiffs-Appellants*.

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented is whether the "enrolled bill rule" articulated by the Supreme Court in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), requires the dismissal of plaintiffs' claims that the Deficit Reduction Act of 2005 ("DRA"), Pub. L. No. 109-171, 120 Stat. 4 (2006), was enacted in violation of the Bicameralism and Presentment Clause, U.S. Const. art. I, § 7, cl. 2, and the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, of the United States Constitution. Agreeing with the recent decision of the United States Court of Appeals for the District of Columbia in *Public Citizen v. United States District Court for the District of Columbia*, 486 F.3d 1342 (D.C. Cir. 2007), we conclude that the holding of *Marshall Field* is directly on point and that the Supreme Court has not overruled or narrowed that holding. Moreover, absent Supreme Court direction, we may not reassess the need for an enrolled bill rule or create exceptions to that rule on the basis of technological and political developments since *Marshall Field* was decided. Thus, faced with allegations that a law is unconstitutional because both houses of Congress did not pass identical bills, a court may not look

2

beyond the version of the bill authenticated by the signatures of the presiding officers of the House of Representatives and Senate. We also conclude that a court may dismiss a claim on the basis of the enrolled bill rule before assessing a plaintiff's standing. The judgment of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*), which dismissed plaintiffs' constitutional claims, is therefore affirmed.

## BACKGROUND

Plaintiff OneSimpleLoan is a company that markets and finances student loans. Plaintiffs Carina D. Ball and Nathan Bazyk are individual borrowers who consolidated their student loans under the Federal Family Education Loan ("FFEL") Program. Plaintiffs allege that they have suffered injury on account of provisions in the DRA that (1) prohibit a method of refinancing FFEL consolidated loans and (2) impose conditions that inhibit companies from providing lower interest rates and better benefits on FFEL consolidated loans. They brought an action against defendants, the United States Secretary of Education and the Secretary's Regional Representative for Region II (which includes New York), seeking injunctive and declaratory relief. Plaintiffs alleged, *inter alia*, that the DRA was unconstitutional because the bill passed by the House of Representatives was not identical to the bill passed earlier by the Senate and presented later to the President. As evidence of this failure to pass identical texts, plaintiffs pointed to a difference between (1) the "engrossed bill" transmitted from the Senate to the House of Representatives after the Senate vote, and (2) the "enrolled bill" presented to the President after having been signed by the Speaker of the House of Representatives and the President Pro Tempore of the Senate.

A. The Bicameralism and Presentment Clause, the Appropriations Clause, Engrossed Bills, and Enrolled Bills

The Bicameralism and Presentment Clause mandates that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the

President of the United States . . . ." U.S. Const. art. I, § 7, cl. 2. A law has been enacted in conformance with this constitutional mandate only if "(1) a bill containing its exact text was approved by a majority of the Members of the House of Representatives; (2) the Senate approved precisely the same text; and (3) that text was signed into law by the President." *Clinton v. City of New York*, 524 U.S. 417, 448 (1998). Plaintiffs claim that the DRA never became a law because the House of Representatives and the Senate did not pass "precisely the same text." Plaintiffs further claim that, because the DRA is not actually a law, it also violates the Appropriations Clause, which states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

"Congress has established specific procedures governing passage of a bill." *Public Citizen*, 486 F.3d at 1344. Those procedures are currently codified at 1 U.S.C. § 106, which provides in relevant part:

> Every bill . . . in each House of Congress shall, when such bill . . . passes either House, be printed, and such printed copy shall be called the *engrossed bill* . . . . Said engrossed bill . . . shall be signed by the Clerk of the House or the Secretary of the Senate, and shall be sent to the other House, and in that form shall be dealt with by that House and its officers, and, if passed, returned signed by said Clerk or Secretary. When such bill . . . shall have passed both Houses, it shall be printed and shall then be called the *enrolled bill*, . . . and shall be signed by the presiding officers of both Houses and sent to the President of the United States.

1 U.S.C. § 106 (emphasis added). *See generally* Charles Tiefer, *Congressional Practice and Procedure* 247-50 (1989) (discussing the processes of "engrossment" and "enrollment"). "An 'engrossed bill' is thus one that has passed one chamber of Congress, while an 'enrolled bill' has passed both the House and the Senate." *Public Citizen*, 486 F.3d at 1344. In the instant case, plaintiffs allege that a discrepancy between the version of the bill passed by the House and the version of the bill passed by the Senate was introduced by a transcription error made during preparation of the engrossed bill and corrected during preparation of the enrolled bill.

4

B.  Enactment of the DRA

The DRA, signed by the President on February 8, 2006, is an omnibus budget act whose broad-ranging provisions affect not just educational lending, but also, *inter alia*, Medicare and Medicaid laws, Hurricane Katrina relief, the transition to digital television broadcasting, and the filing fees for civil actions in federal district courts.  *See id.*

The following facts regarding the DRA's enactment are drawn from plaintiffs' complaint.[1] Most of the facts contained in the complaint are summarized by the District of Columbia Circuit in *Public Citizen*:[2]

> [I]n the Fall of 2005, the House and Senate passed different versions of a budget bill referred to as S. 1932.  To iron out the differences, the legislation was sent to a conference committee.  The committee produced a conference report which failed to pass the Senate.  Shortly thereafter the Senate passed an amended version of S. 1932 wherein § 5101 specified a 13-month duration of Medicare payments for certain durable medical equipment.[3]  However, when the Senate clerk transmitted the engrossed S. 1932 to the House, he mistakenly changed § 5101 of the bill to reflect a 36-month duration of payments for durable medical equipment rather than the 13-month duration actually approved by the Senate.  The House voted on this engrossed bill, including the erroneous duration figure.[4]  Because the legislation originated in the Senate, the House returned it to the Senate

---

[1] For the moment, we defer discussion of whether it is necessary to accept as true the facts presented in a plaintiff's pleadings when a defendant moves for dismissal on the basis of the enrolled bill rule.  *See* pages 10-11 *post* (discussing the enrolled bill rule's status as a non-merits threshold ground for dismissal).

[2] In *Public Citizen*, the District of Columbia Circuit dealt with the same constitutional challenge to the DRA that we do in the instant case.  *Public Citizen*, 486 F.3d at 1343 ("Public Citizen, a not-for-profit consumer advocacy organization, filed suit in District Court claiming that the [DRA] is invalid because the bill that was presented to the President did not first pass both chambers of Congress in the exact same form.").  The plaintiff in *Public Citizen* has submitted an *amicus* brief to our Court in support of plaintiffs here.

Several district courts in other Circuits have rejected similar constitutional challenges to the DRA.  *See Zeigler v. Gonzales*, No. 06-0080-CG-M, 2007 WL 1875945 (S.D. Ala. June 28, 2007); *Conyers v. Bush*, No. 06-11972, 2006 WL 3834224 (E.D. Mich. Nov. 6, 2006); *State of Cal., Dep't of Soc. Servs. v. Leavitt*, 444 F. Supp. 2d 1088 (E.D. Cal. 2006).

[3] The Vice President of the United States, as President of the Senate, U.S. Const. art. I, § 3, cl. 4, cast a tie-breaking vote in favor of the bill.

[4] The bill passed by a vote of 216 to 214.

5

for enrollment. The Senate clerk, recognizing the transcription error in the engrossed bill, altered the text of the enrolled bill so that it included a 13-month rather than a 36-month duration. The version of the DRA signed by the presiding officers contains the 13-month figure. Thus, since the 13-month duration term in the enrolled bill passed the Senate but not the House, the President signed legislation that did not actually pass both houses of Congress in precisely the same form.

*Id.* at 1345. Additionally, plaintiffs in the instant case allege that (1) there existed a "legally improper arrangement among certain representatives of the House, Senate and Executive Branch to have the President sign" legislation that had not been enacted pursuant to the Constitution; (2) the Speaker of the House of Representatives and the President Pro Tempore of the Senate were aware of the discrepancy between the engrossed bill and the enrolled bill when they signed the enrolled bill; and (3) after the President signed the DRA, the Senate passed a concurrent resolution hoping to rectify the constitutional deficiency, but the House of Representatives never passed this resolution.

C. Proceedings in the District Court

Plaintiffs commenced this action in April 2006. In May 2006, they moved for summary judgment and, in the alternative, for a preliminary injunction that would prevent implementation of the allegedly injurious student loan provisions of the DRA. Defendants cross-moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). In a decision and order dated June 9, 2006, the District Court determined that plaintiffs' constitutional claims were subject to dismissal under the enrolled bill rule announced in *Marshall Field*. The District Court rejected plaintiffs' arguments that (1) the enrolled bill rule was dicta and (2) in any event, the Supreme Court had overruled the enrolled bill rule in *United States v. Munoz-Flores*, 495 U.S. 385 (1990). In addition to dismissing the constitutional claims on the basis of the enrolled bill rule, the District Court in its June 9, 2006 decision and order made some ambiguous remarks regarding plaintiffs' standing to pursue those claims. However, at subsequent status conferences, the District Court expressed the belief that its June 9, 2006 decision and order had not resolved the question of standing with respect to plaintiffs'

6

constitutional claims.

Although certain non-constitutional claims remained pending before the District Court, plaintiffs filed a notice of appeal on June 12, 2006. When those non-constitutional claims were mooted by new legislation, plaintiffs filed a second notice of appeal on June 26, 2006, on the theory that the June 9, 2006 decision and order had become final. In an order entered on August 9, 2006, the District Court determined that plaintiffs had never appealed from a final order and that it therefore retained jurisdiction to decide the issue of standing with respect to the constitutional claims. It then concluded that plaintiffs lacked standing, in part because they had not alleged an injury that would likely be redressed by a judgment in their favor. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The Court reasoned that the remedy for a constitutional violation would be to sever the Medicare provision not passed by the House of Representatives from the remainder of the DRA, leaving in force the student loan provisions allegedly causing harm to plaintiffs. The Court also reiterated that the enrolled bill rule required dismissal of plaintiffs' constitutional claims. At the end of the August 9, 2006 order, the District Court directed the Clerk to close the case. Plaintiffs filed a third notice of appeal on August 10, 2006.[5]

## DISCUSSION

A. *Marshall Field*

In *Marshall Field*, several importers protesting the assessment of duties under the Tariff Act of October 1, 1890 claimed that "the act was not a law of the United States." 143 U.S. at 665-66. The Supreme Court described the importers' principal contention as follows:

> The contention of the appellants is that [the] enrolled act, in the custody of
> the Secretary of State, and appearing, upon its face to have become a law in

---

[5] Because plaintiffs' multiple notices of appeal ensure timeliness, and because we can *nostra sponte* address any argument on standing not presented to or decided by the District Court, we need not consider whether it was possible for plaintiffs to appeal at any time before August 9, 2006, or whether the District Court properly concluded that it retained jurisdiction to decide the standing issue.

the mode prescribed by the Constitution, is to be deemed an absolute nullity, in all its parts, because—such is the allegation—it is shown by the Congressional record of proceedings, reports of committees of each house, reports of committees of conference, and other papers printed by authority of Congress, and having reference to [the bill in question], that a section of the bill, as it finally passed, was not in the bill authenticated by the signatures of the presiding officers of the respective houses of Congress, and approved by the President.

*Id.* at 668-69. In other words, the importers were arguing that neither house of Congress had passed a version of the bill identical to the enrolled bill. The importers "rest[ed] their contention" on the Journal Clause of the Constitution, U.S. Const. art. I, § 5, cl. 3,[6] which they claimed made congressional journals "the best, if not conclusive evidence upon the issue as to whether a bill was, in fact, passed by the two houses of Congress." *Marshall Field*, 143 U.S. at 670.

The Supreme Court rejected this interpretation of the Journal Clause and stated that nothing in the Constitution "prescribe[s] the mode in which the fact of the original passage of a bill by the House of Representatives and the Senate shall be authenticated, or preclude[s] Congress from adopting any mode to that end which its wisdom suggests." *Id.* at 671. Noting that the Constitution does not "expressly require bills that have passed Congress to be attested by the signatures of the presiding officers of the two houses," the Court observed that "usage, the orderly conduct of legislative proceedings and the rules under which the two bodies have acted since the organization of the government, require that mode of authentication." *Id.* The Court then concluded that "when a bill, thus attested, receives [the President's] approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable." *Id.* at 672. Recognizing that separation-of-powers concerns were at issue, the Court elaborated that "[t]he respect due to coequal and independent departments requires the judicial department to act upon that

---

[6] The Journal Clause states that "[e]ach House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal." U.S. Const. art. I, § 5, cl. 3.

assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated." *Id.*

The Supreme Court in *Marshall Field* admitted that the rule thereby established would allow the continued enforcement of legislation that had not been enacted in the manner prescribed by the Constitution. *See id.* at 675. However, it reasoned that

> [b]etter, far better, that a provision should occasionally find its way into the statute through mistake, or even fraud, than that every act, state and national, should at any and all times be liable to be put in issue and impeached by the journals, loose papers of the legislature, and parole evidence. Such a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable.

*Id.* (quoting *Sherman v. Story*, 30 Cal. 253, 275 (1866)).

In concluding its discussion of Congress's alleged failure to pass the precise text of the act in question, the Court set forth "a clear rule" requiring the judicial branch to treat an enrolled bill signed by the presiding officers of the House and Senate as conclusive evidence of the text passed by both houses of Congress. *Public Citizen*, 486 F.3d at 1350. Under *Marshall Field*, "it is not competent" for a plaintiff alleging that a statute is void because Congress did not pass the exact text appearing in an authenticated enrolled bill "to show, from the journals of either house, from the reports of committees, or from other documents printed by authority of Congress," that the bills actually passed by the two houses of Congress differed from the enrolled bill. *Marshall Field*, 143 U.S. at 680.

The rule articulated by the Supreme Court in *Marshall Field* became known as the "enrolled bill rule" and has been described by our Court as "a longstanding rule, invoked by many courts, including the Supreme Court and our own Court." *United States v. Pabon-Cruz*, 391 F.3d 86, 99 (2d Cir. 2004) (holding that the enrolled bill rule does not prevent courts from considering legislative history when determining how to interpret and apply statutory language). As we have observed, the enrolled bill rule "provides that [i]f a legislative document is authenticated in regular form by the appropriate officials, the court[s] treat[ ] that document as properly adopted." *Id.* (alterations in original) (quoting *United*

*States v. Sitka*, 845 F.2d 43, 46 (2d Cir. 1988) (quoting *United States v. Thomas*, 788 F.2d 1250, 1253 (7th Cir. 1986) (citing *Marshall Field*, 143 U.S. at 672-73))) (internal quotation marks omitted).

The plain language of *Marshall Field* appears to foreclose plaintiffs' constitutional claims in the instant case, which would require our Court to look beyond the authenticated enrolled bill for evidence that the House and Senate did not pass identical texts. Yet plaintiffs present a variety of arguments urging us to decide that *Marshall Field* does not mean what it says. They also assert that they have standing under the Constitution to pursue their claims. We conclude that plaintiffs' arguments regarding the inapplicability of the enrolled bill rule are without merit, and we note that it is for the Supreme Court rather than a court of inferior jurisdiction to determine whether the venerable enrolled bill rule requires revision in light of technological and political developments since *Marshall Field* was decided in 1892. We also conclude that a court may dismiss claims pursuant to the enrolled bill rule before addressing whether a plaintiff has standing.

B. The Enrolled Bill Rule Is a "Non-Merits Threshold Ground for Dismissal"

We first consider whether it is necessary for a court to determine if a plaintiff satisfies the "irreducible constitutional minimum of standing" before deciding whether the enrolled bill rule applies. *Lujan*, 504 U.S. at 560. We agree with the District of Columbia Circuit that "[a]t a minimum, the *Marshall Field* rule is . . . a non-merits threshold ground for dismissal" that cuts off judicial inquiry into a plaintiff's constitutional claims based on the alleged failure of Congress (whether one house or both) to pass the precise text of a statute. *Public Citizen*, 486 F.3d at 1349; *see Marshall Field*, 143 U.S. at 675 (recognizing that application of the enrolled bill rule will allow unconstitutional laws to survive). Like other rules that are "designed not merely to defeat the asserted claims, but to preclude judicial inquiry," *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005), or that "deny[ ] audience to a case on the merits," *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999), the enrolled bill rule may support dismissal of a claim before a court assesses its authority to hear that claim. *See Public Citizen*, 486 F.3d at 1345-49; *cf. Sinochem Int'l*

10

*Co. v. Malaysia*, – U.S. –, 127 S. Ct. 1184, 1188 (2007) (permitting dismissal on the ground of *forum non conveniens* before consideration of jurisdictional issues); *Tenet*, 544 U.S. at 6 n.4 (allowing dismissal of a suit involving covert espionage agreements on public policy grounds before consideration of jurisdictional issues); *Ellis v. Dyson*, 421 U.S. 426, 433-34 (1975) (permitting abstention under *Younger v. Harris*, 401 U.S. 37 (1971), before consideration of whether there is an Article III case or controversy).

As the District of Columbia Circuit pointed out in *Public Citizen*, because the enrolled bill rule is a "non-merits threshold ground for dismissal," *Public Citizen*, 486 F.3d at 1349, it "does not authorize a merits dismissal for failure to state a claim" under Fed. R. Civ. P. 12(b)(6), *id.* at 1348. Consequently, a district court need not accept as true the facts alleged in a plaintiff's pleadings when a defendant moves to dismiss pursuant to the enrolled bill rule. *Cf. McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) ("In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) . . ., we accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."). Rather, the district court must determine (1) whether the presiding officers of the House and Senate in fact signed the enrolled bill, thereby attesting to its passage, and (2) whether the enrolled bill rule requires dismissal of a particular claim as a matter of law. A court of appeals would then review the district court's factual findings under a clearly erroneous standard and its legal conclusions *de novo*. *Cf. Gualandi v. Adams*, 385 F.3d 236, 240 (2d Cir. 2004) ("In reviewing a district court's determination of whether it has subject matter jurisdiction, we review factual findings for clear error and legal conclusions *de novo*.").

In the instant case, there is no dispute as to whether the Speaker of the House of Representatives and the President Pro Tempore of the Senate signed the enrolled bill that would subsequently become the DRA. Thus, we need only review the District Court's legal conclusions regarding application of the enrolled bill rule to the particular claims at issue.

C.  The Enrolled Bill Rule Was Not Dicta

Plaintiffs and *amicus* Public Citizen argue that the Supreme Court's holding in *Marshall Field* extended only to congressional journals and that the prohibition against considering all "other documents printed by authority of Congress," *Marshall Field*, 143 U.S. at 680, was merely expansive dicta.  This argument was presented to the District of Columbia Circuit in *Public Citizen* and convincingly rejected by that court.  We agree that "*Marshall Field*'s plain language and justification cannot be read to create a rule of dismissal limited to the claims of plaintiffs who rely primarily upon journals to rebut an attested enrolled bill."  *Public Citizen*, 486 F.3d at 1351.  The Supreme Court articulated an expansive rule in *Marshall Field* because such a rule was necessary to answer the expansive question before the Court, *see Marshall Field*, 143 U.S. at 668-69, 680, notwithstanding that the appellants' strongest argument lay in their interpretation of the Journal Clause.  Moreover, neither the Supreme Court's concern for stability nor its attentiveness to the constitutional doctrine of separation of powers "applies solely to impeachment by journals."  *Public Citizen*, 486 F.3d at 1351.  Permitting litigants to impeach the text of an enrolled bill by other congressional documents would likewise create "uncertainty in the statute laws," *Marshall Field*, 143 U.S. at 675 (quoting *Sherman*, 30 Cal. at 275), and require courts to conduct inquiries that impinge upon the "respect due to coequal and independent departments," *id.* at 672.  Finally, the Supreme Court's own subsequent interpretation of *Marshall Field*'s holding requires us to reject plaintiffs' argument that *Marshall Field* did nothing but prevent litigants from challenging the text of an enrolled bill through congressional journals.  *See United States v. Munoz-Flores*, 495 U.S. 385, 391 n.4 (1990) ("The Court rejected [appellants'] interpretation of the Journal Clause, *holding that the Constitution left it to Congress to determine how a bill is to be authenticated as having passed*." (emphasis added)).

Plaintiffs also argue that the scope of the holding of *Marshall Field*  was cast into doubt by the Supreme Court's inspection of congressional journals in *United States v. Ballin*, 144 U.S. 1 (1892), a case

decided on the same day as *Marshall Field*. This argument, which would render *Marshall Field* meaningless with respect to the one source of evidence plaintiffs concede was at issue, is without merit. In *Ballin*, the Court considered whether another tariff act had been "legally passed." *Id.* at 3. The Court addressed whether a quorum of the House of Representatives had been present "to do Business," U.S. Const. art I, § 5, cl. 1, and whether the bill before the House received a sufficient number of votes. *See Ballin*, 144 U.S. at 3-9. The Court first observed that, as a general matter, "whenever a question arises in a court of law of the existence of a statute . . ., the judges who are called upon to decide it have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such question." *Id.* at 3 (quoting *Gardner v. Collector*, 73 U.S. (6 Wall.) 499, 511 (Dec. Term 1867)). The Court then noted its decision in *Marshall Field* and stated "[i]t is unnecessary to add anything here to that general discussion." *Id.* at 4. *Ballin* in no way purported to disturb *Marshall Field*'s holding as expressed by the plain language of that case itself and reaffirmed by the Supreme Court in *Munoz-Flores*.

Indeed, the Supreme Court's analysis in *Ballin* appears to reinforce its reasoning in *Marshall Field*. In *Ballin*, the Court inspected the House's journal only after "[a]ssuming that by reason of [the Journal Clause] reference may be had to the journal, to see whether the yeas and nays were ordered, and if so, what was the vote disclosed thereby." *Id.* In contrast, the *Marshall Field* Court made plain that the Constitution grants Congress full discretion in deciding how to authenticate the particular text of a bill passed by both houses. *See Marshall Field*, 143 U.S. at 671. Moreover, in *Ballin*, the Court noted that the House of Representatives had itself implemented a rule requiring that certain information regarding voting be recorded in the journal. *See Ballin*, 144 U.S. at 5. The Court respected the House's discretion "to determine its rules of proceedings," *id.* at 5, accepting as true the information contained in the journal even though it might be erroneous, *see id.* at 4. In the same way, the Court in *Marshall Field* respected Congress's discretion to prescribe the authentication of an

enrolled bill's text, even though that text might not have actually passed both houses. *See Marshall Field*, 143 U.S. at 672, 675.

D. The Enrolled Bill Rule Has Not Been Overruled or Modified by the Supreme Court

Plaintiffs' principal contention on appeal is that, whatever *Marshall Field* meant in 1892, the Supreme Court has subsequently restricted its application "to cases where a constitutional requirement binding Congress is absent," Appellants' Reply Br. 1, or has at least "squarely confine[d] *Field* to a Journal Clause controversy," *id.* at 3. Plaintiffs' sole support for this argument is what Judge Edwards of the District of Columbia Circuit styled an "oblique footnote" in *Munoz-Flores. Public Citizen*, 486 F.3d at 1352. Like the District of Columbia Circuit, we too "are satisfied that the Court's decision in *Munoz-Flores* does not purport to overrule or modify the enrolled bill rule." *Id.* at 1355.

In *Munoz-Flores*, a criminal defendant challenged the constitutionality of a provision of the Victims of Crime Act, 18 U.S.C. § 3013. He argued that the provision, "which requires courts to impose a mandatory special assessment on any person convicted of a felony misdemeanor," *Munoz-Florez*, 495 U.S. at 387 (internal quotation marks omitted), was passed in violation of the Constitution's Origination Clause, which states that "[a]ll Bills for raising Revenue shall originate in the House of Representatives," U.S. Const. art. I, § 7, cl. 1. *See Munoz-Flores*, 495 U.S. at 387. The Supreme Court eventually determined that the provision did not violate the Origination Clause because it was not a bill for raising revenue. *See id.* at 401. However, before doing so, the Court discussed whether the case was justiciable under the "political question doctrine," ultimately concluding that it was. *See id.* at 389-96.

Justice Scalia, in an opinion concurring in the judgment, stated that *Marshall Field* prohibits judicial inquiry into the origination of a statute where an authenticated enrolled bill contains the designation "H.J. Res.," an abbreviation for "House Joint Resolution." *See id.* at 408-10 (Scalia, J., concurring in the judgment). The majority addressed Justice Scalia's position in a footnote containing the majority opinion's lone mention of *Marshall Field*. The footnote read:

14

[Justice Scalia] contends that Congress' resolution of the constitutional question in passing the bill bars this Court from independently considering that question. The only case he cites for his argument is *Marshall Field & Co. v. Clark*. But *Field* does not support his argument. That case concerned "the nature of the evidence" the Court would consider in determining whether a bill had actually passed Congress. Appellants had argued that the constitutional Clause providing that "[e]ach House shall keep a Journal of its Proceedings" implied that whether a bill had passed must be determined by an examination of the journals. The Court rejected that interpretation of the Journal Clause, holding that the Constitution left it to Congress to determine how a bill is to be authenticated as having passed. In the absence of any constitutional requirement binding Congress, we stated that "[t]he respect due to coequal and independent departments" demands that the courts accept as passed all bills authenticated in the manner provided by Congress. Where, as here, a constitutional provision *is* implicated, *Field* does not apply.

*Munoz-Flores*, 495 U.S. at 391 n.4 (citations omitted).

Plaintiffs interpret this footnote as rendering the enrolled bill rule inapplicable to their constitutional claims under the Bicameralism and Presentment Clause and the Appropriations Clause. We disagree. Although "the language of the *Munoz-Flores* footnote is cumbersome, making it difficult to discern precisely what the Court meant to say," *Public Citizen*, 486 F.3d at 1354, we think it clear that the Court did not intend to change the fundamental parameters of the enrolled bill rule established in *Marshall Field*—namely, that courts must "accept, as having passed Congress, all bills authenticated" by the signatures of the presiding officers of the House and Senate, *Marshall Field*, 143 U.S. at 672. The *Munoz-Flores* "oblique footnote" repeatedly refers to the basic constitutional deficiency alleged in *Marshall Field*, which was that the statute in question had not passed both houses of Congress in a form identical to the enrolled bill. That same alleged deficiency underlies plaintiffs' claims in the instant case. Moreover, as mentioned above, *see* page 12 *ante*, the footnote describes *Marshall Field*'s holding in broad terms, providing no indication that it applies only to particular types of evidence. Whatever plausible alternative interpretations may be supported by the language of the "oblique footnote," plaintiffs'

15

reading is not one of them.[7]  *See Public Citizen*, 486 F.3d at 1354-55 (discussing what the *Munoz-Flores*

Court might have meant when it stated that a constitutional provision was not implicated in *Marshall*

*Field*).

E.  We May Not Create Exceptions to the Enrolled Bill Rule Based on Technological and Political
Developments Since *Marshall Field* Was Decided

Plaintiffs and *amici* offer two additional reasons why the enrolled bill rule should not apply in

the instant case: (1) the engrossed bill, whose production is required by statute, is more reliable than the

congressional documents presented as evidence of a constitutional violation in *Marshall Field*; and (2)

plaintiffs allege a conspiracy to subvert the Constitution by the presiding officers of Congress and the

President.  Neither of these arguments is availing.

First, although technological advances in printing and copying since the late nineteenth century

may have removed some of the sources of unreliability in congressional documents, the facts alleged by

plaintiffs in this case reveal that even engrossed bills printed today are subject to error or mishandling.

Indeed, such advances may provide new ways to alter a bill's text during the legislative process.

Additionally, while the Supreme Court in *Marshall Field* contemplated that Congress could change its

internal bill authentication procedure if it wanted to, *see Marshall Field*, 143 U.S. at 675 (quoting *Sherman*,

30 Cal. at 275, for the proposition that departure from the enrolled bill rule is required in certain States

because there exists "some express constitutional or statutory provision requiring some relaxation of

the rule"), Congress has not done so.  Nothing in 1 U.S.C. § 106, expressly or otherwise, limits the

---

[7] In other words, the *Munoz-Flores* footnote refuses to extend, but does not retract, the enrolled bill rule.  That said, we do agree with plaintiffs that the Supreme Court has been less than clear in explaining why courts may probe congressional documents when adjudicating some types of constitutional claims but not others.  In the context of a claim that seeks to impeach the authenticated text of an enrolled bill, the Court may regard as unique the "usage, the orderly conduct of legislative proceedings, and the rules under which the [houses of Congress] have acted since the organization of the government, requir[ing] that mode of authentication."  *Marshall Field*, 143 U.S. at 671.  Or the Court may consider the textual inconsistencies invoked in a bicameralism challenge to be a greater source of "uncertainty in the statute laws of the land," *id*. at 675 (quoting *Sherman*, 30 Cal. at 275), than other grounds for constitutional challenges.  In any event, our task is to apply clearly established Supreme Court precedent, not to speculate on the reasons the Supreme Court might have had for creating this precedent.

16

longstanding authority of the presiding officers of the House and Senate to attest to the passage of an enrolled bill's text. *See* page 4 *ante* (quoting 1 U.S.C. § 106).

Second, we do not agree with plaintiffs' argument (supported by several members of the House of Representatives acting as *amici*) that *Marshall Field* creates an exception to the enrolled bill rule in certain cases involving allegations that the presiding officers of Congress and the President of the United States conspired to violate the Constitution by enacting legislation that had not passed both the House and Senate. As it happens, the Supreme Court in *Marshall Field* responded to the contention that under the enrolled bill rule "it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that was never passed by Congress":

> But this possibility is too remote to be seriously considered in the present inquiry. It suggests a deliberate conspiracy to which the presiding officers, the committees on enrolled bills, and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed by the Constitution.

*Marshall Field*, 143 U.S. at 672-73. Plaintiffs and *amici* seize upon the Court's statement that the possibility of a conspiracy was "too remote to be considered in the present inquiry," arguing that where the likelihood of a conspiracy is greater, the enrolled bill rule does not apply. Yet the Court's next sentence warned that "[j]udicial action based upon . . . a suggestion [of conspiracy] is forbidden by the respect due to a co-ordinate branch of the government." *Id.* at 673. In light of the separation-of-powers concerns at the forefront of *Marshall Field*, which are surely undiminished by the passage of time, we do not think it plausible that the judicial branch must, before deciding if the enrolled bill rule applies, conduct threshold inquiries into how likely it was for a particular set of legislative and executive actors to conspire in alleged constitutional violations. Whether the enrolled bill rule has come to serve as an incentive for politicians to avoid the rigors of constitutional law-making is a different question. The answer might provide a policy argument against strict application of the enrolled bill rule, but we

17

are bound to follow Supreme Court precedent as it currently exists.

In the last analysis, even if plaintiffs' arguments support the creation of exceptions to the enrolled bill rule in some circumstances (or militate toward abandoning the rule altogether), we are not at liberty to depart from binding Supreme Court precedent "unless and until [the] Court reinterpret[s]" that precedent. *Agostini v. Felton*, 521 U.S. 203, 238 (1997); *accord United States v. Quinones*, 313 F.3d 49, 62 n.10 (2d Cir. 2002). Plaintiffs' constitutional claims are therefore foreclosed by *Marshall Field*, and dismissal by the District Court was appropriate.

*          *          *

For the foregoing reasons, the judgment of the District Court is **AFFIRMED**.