Opinion by Judge FISHER; Concurrence by Judge BEA; Dissent by Judge MICHAEL DALY HAWKINS.
OPINION
FISHER, Circuit Judge.
This case requires us to address the difficult balance the state secrets doctrine strikes between fundamental principles of our liberty, including justice, transparency, accountability and national security. Although as judges we strive to honor all of these principles, there are times when exceptional circumstances create an irreconcilable conflict between them. On those rare occasions, we are bound to follow the Supreme Court’s admonition that “even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that [state] secrets are at stake.” United States v. Reynolds, 345 U.S. 1, 11, 73 S.Ct. 528, 97 L.Ed. 727 (1953). After much deliberation, we reluctantly conclude this is such a case, and the plaintiffs’ action must be dismissed. Accordingly, we affirm the judgment of the district court.
I. Background
We begin with the factual and procedural history relevant to this appeal. In doing so, we largely draw upon the three-judge panel’s language in Mohamed v. Jeppesen Dataplan, Inc., 579 F.3d 943, 949-52 (9th Cir.) (Jeppesen I), rehearing en banc granted, 586 F.3d 1108 (9th Cir.2009). We emphasize that this factual background is based only on the allegations of plaintiffs’ complaint, which at this stage in the litigation we construe “in the light most favorable to the plaintiff[s], taking all [them] allegations as true and drawing all reasonable inferences from the complaint in [their] favor.” Doe v. United States, 419 F.3d 1058, 1062 (9th Cir.2005). Whether plaintiffs’ allegations are in fact true has not been decided in this litigation, and, given the sensitive nature of the allegations, nothing we say in this opinion should be understood otherwise.
A. Factual Background

1. The Extraordinary Rendition Program

Plaintiffs allege that the Central Intelligence Agency (“CIA”), working in concert with other government agencies and officials of foreign governments, operated an extraordinary rendition program to gather intelligence by apprehending foreign nationals suspected of involvement in terrorist activities and transferring them in secret to foreign countries for detention and interrogation by United States or foreign officials. According to plaintiffs, this program has allowed agents of the U.S. government “to employ interrogation methods that would [otherwise have been] prohibited under federal or international law.” *1074 Relying on documents in the public domain, plaintiffs, all foreign nationals, claim they were each processed through the extraordinary rendition program. They also make the following individual allegations.
Plaintiff Ahmed Agiza, an Egyptian national who had been seeking asylum in Sweden, was captured by Swedish authorities, allegedly transferred to American custody and flown to Egypt. In Egypt, he claims he was held for five weeks “in a squalid, windowless, and frigid cell,” where he was “severely and repeatedly beaten” and subjected to electric shock through electrodes attached to his ear lobes, nipples and genitals. Agiza was held in detention for two and a half years, after which he was given a six-hour trial before a military court, convicted and sentenced to 15 years in Egyptian prison. According to plaintiffs, “[vjirtually every aspect of Agiza’s rendition, including his torture in Egypt, has been publicly acknowledged by the Swedish government.”
Plaintiff Abou Elkassim Britel, a 40-year-old Italian citizen of Moroccan origin, was arrested and detained in Pakistan on immigration charges. After several months in Pakistani detention, Britel was allegedly transferred to the custody of American officials. These officials dressed Britel in a diaper and a torn t-shirt and shackled and blindfolded him for a flight to Morocco. Once in Morocco, he says he was detained incommunicado by Moroccan security services at the Temara prison, where he was beaten, deprived of sleep and food and threatened with sexual torture, including sodomy with a bottle and castration. After being released and re-detained, Britel says he was coerced into signing a false confession, convicted of terrorism-related charges and sentenced to 15 years in a Moroccan prison.
Plaintiff Binyam Mohamed, a 28-year-old Ethiopian citizen and legal resident of the United Kingdom, was arrested in Pakistan on immigration charges. Mohamed was allegedly flown to Morocco under conditions similar to those described above, where he claims he was transferred to the custody of Moroccan security agents. These Moroccan authorities allegedly subjected Mohamed to “severe physical and psychological torture,” including routinely beating him and breaking his bones. He says they cut him with a scalpel all over his body, including on his penis, and poured “hot stinging liquid” into the open wounds. He was blindfolded and handcuffed while being made “to listen to extremely loud music day and night.” After 18 months in Moroccan custody, Mohamed was allegedly transferred back to American custody and flown to Afghanistan. He claims he was detained there in a CIA “dark prison” where he was kept in “near permanent darkness” and subjected to loud noise, such as the recorded screams of women and children, 24 hours a day. Mohamed was fed sparingly and irregularly and in four months he lost between 40 and 60 pounds. Eventually, Mohamed was transferred to the U.S. military prison at Guantanamo Bay, Cuba, where he remained for nearly five years. He was released and returned to the United Kingdom during the pendency of this appeal.[1]
Plaintiff Bisher al-Rawi, a 39-year-old Iraqi citizen and legal resident of the United Kingdom, was arrested in Gambia while traveling on legitimate business. Like the other plaintiffs, al-Rawi claims he was put in a diaper and shackles and placed on an *1075 airplane, where he was flown to Afghanistan. He says he was detained in the same “dark prison” as Mohamed and loud noises were played 24 hours per day to deprive him of sleep. Al-Rawi alleges he was eventually transferred to Bagram Air Base, where he was “subjected to humiliation, degradation, and physical and psychological torture by U.S. officials,” including being beaten, deprived of sleep and threatened with death. Al-Rawi was eventually transferred to Guantanamo; in preparation for the flight, he says he was “shackled and handcuffed in excruciating pain” as a result of his beatings. Al-Rawi was eventually released from Guantanamo and returned to the United Kingdom.
Plaintiff Farag Ahmad Bashmilah, a 38-year-old Yemeni citizen, says he was apprehended by agents of the Jordanian government while he was visiting Jordan to assist his ailing mother. After a brief detention during which he was “subjected] to severe physical and psychological abuse,” Bashmilah claims he was given over to agents of the U.S. government, who flew him to Afghanistan in similar fashion as the other plaintiffs. Once in Afghanistan, Bashmilah says he was placed in solitary confinement, in 24-hour darkness, where he was deprived of sleep and shackled in painful positions. He was subsequently moved to another cell where he was subjected to 24-hour light and loud noise. Depressed by his conditions, Bashmilah attempted suicide three times. Later, Bashmilah claims he was transferred by airplane to an unknown CIA “black site” prison, where he “suffered sensory manipulation through constant exposure to white noise, alternating with deafeningly loud music” and 24-hour light. Bashmilah alleges he was transferred once more to Yemen, where he was tried and convicted of a trivial crime, sentenced to time served abroad and released.

2. Jeppesen’s Alleged Involvement in the Rendition Program

Plaintiffs contend that publicly available information establishes that defendant Jeppesen Dataplan, Inc., a U.S. corporation, provided flight planning and logistical support services to the aircraft and crew on all of the flights transporting each of the five plaintiffs among the various locations where they were detained and allegedly subjected to torture. The complaint asserts “Jeppesen played an integral role in the forced” abductions and detentions and “provided direct and substantial services to the United States for its so-called ‘extraordinary rendition’ program,” thereby “enabling the clandestine and forcible transportation of terrorism suspects to secret overseas detention facilities.” It also alleges that Jeppesen provided this assistance with actual or constructive “knowledge of the objectives of the rendition program,” including knowledge that the plaintiffs “would be subjected to forced disappearance, detention, and torture” by U.S. and foreign government officials.[2]
B. Summary of the Claims
Plaintiffs brought suit against Jeppesen under the Alien Tort Statute, 28 U.S.C. § 1350, alleging seven theories of liability marshaled under two claims, one for “forced disappearance” and another for “torture and other cruel, inhuman or degrading treatment.” First Am. Compl. ¶¶ 253-66.
With respect to the forced disappearance claim, plaintiffs assert four theories of liability: (1) direct liability for active participation, (2) conspiracy with agents of the *1076 United States, (3) aiding and abetting agents of the United States and (4) direct liability “because [Jeppesen] demonstrated a reckless disregard as to whether Plaintiffs would be subjected to forced disappearance through its participation in the extraordinary rendition program and specifically its provision of flight and logistical support services to aircraft and crew that it knew or reasonably should have known would be used to transport them to secret detention and interrogation.” Id. ¶¶ 254-57.
On the torture and degrading treatment claim, plaintiffs assert three theories of liability: (1) conspiracy with agents of the U.S. in plaintiffs’ torture and degrading treatment, (2) aiding and abetting agents of the U.S. in subjecting plaintiffs to torture and degrading treatment and (3) direct liability “because [Jeppesen] demonstrated a reckless disregard as to whether Plaintiffs would be subjected to torture or other cruel, inhuman, or degrading treatment by providing flight and logistical support to aircraft and crew it knew or reasonably should have known would be used in the extraordinary rendition program to transport them to detention and interrogation.” Id. ¶¶ 262-64.
Regarding Jeppesen’s alleged actual or constructive knowledge that its services were being used to facilitate “forced disappearance,” plaintiffs allege that Jeppesen “knew or reasonably should have known that the flights involved the transportation of terror suspects pursuant to the extraordinary rendition program,” that their “knowledge of the objectives of the rendition program” may be inferred from the fact that they allegedly “falsified flight plans submitted to European air traffic control authorities to avoid public scrutiny of CIA flights” and that a Jeppesen employee admitted actual knowledge that the company was performing extraordinary rendition flights for the U.S. government. Id. ¶¶ 16, 17, 56. Similarly, plaintiffs allege that Jeppesen knew or should have known that that torture would result because it should have known it was carrying terror suspects for the CIA and that “the governments of the destination countries routinely subject detainees to torture and other forms of cruel, inhuman, or degrading treatment.” Id. ¶¶ 17, 56. They also rely on U.S. State Department country reports describing torture as “routine” in some of the countries to which plaintiffs were allegedly rendered, and note that Jeppesen claims on its website that it “monitors political and security situations” as part of its trip planning services. Id. ¶¶ 14, 42, 56.
C. Procedural History
Before Jeppesen answered the complaint, the United States moved to intervene and to dismiss plaintiffs’ complaint under the state secrets doctrine. The then-Director of the CIA, General Michael Hayden, filed two declarations in support of the motion to dismiss, one classified, the other redacted and unclassified. The public declaration states that “[disclosure of the information covered by this privilege assertion reasonably could be expected to cause serious — and in some instances, exceptionally grave — damage to the national security of the United States and, therefore, the information should be excluded from any use in this case.” It further asserts that “because highly classified information is central to the allegations and issues in this[1] case, the risk is great that further litigation will lead to disclosures harmful to U.S. national security and, accordingly, this case should be dismissed.”
The district court granted the motions to intervene and dismiss and entered judgment in favor of Jeppesen, stating that “at the core of Plaintiffs’ case against Defendant Jeppesen are ‘allegations’ of covert *1077 U.S. military or CIA operations in foreign countries against foreign nationals — clearly a subject matter which is a state secret.” Plaintiffs appealed. A three-judge panel of this court reversed and remanded, holding that the government had failed to establish a basis for dismissal under the state secrets doctrine but permitting the government to reassert the doctrine at subsequent stages of the litigation. Jeppesen I, 579 F.3d at 953, 961-62. We took the case en banc to resolve questions of exceptional importance regarding the scope and application of the state secrets doctrine. See Fed. R.App. P. 35(a)(2).
The government maintains its assertion of privilege on appeal, continuing to rely on General Hayden’s two declarations. While the appeal was pending Barack Obama succeeded George W. Bush as President of the United States. On September 23, 2009, the Obama administration announced new policies for invoking the state secrets privilege, effective October 1, 2009, in a memorandum from the Attorney General. See Memorandum from the Attorney Gen. to the Heads of Executive Dep’ts and Agencies on Policies and Procedures Governing Invocation of the State Secrets Privilege (Sept. 23, 2009) (“Holder Memo”), http://www.justice.gov/opa/ documents/state-secret-privileges.pdf. The government certified both in its briefs and at oral argument before the en banc court that officials at the “highest levels of the Department of Justice” of the new administration had reviewed the assertion of privilege in this case and determined that it was appropriate under the newly announced policies. See Redacted, Unclassified Br. for U.S. on Reh’g En Banc (“U.S. Br.”) 3.
II. Standard of Review
We review de novo the interpretation and application of the state secrets doctrine and review for clear error the district court’s underlying factual findings. Al-Haramain Islamic Found., Inc. v. Bush, 507 F.3d 1190, 1196 (9th Cir.2007).
III. The State Secrets Doctrine
The Supreme Court has long recognized that in exceptional circumstances courts must act in the interest of the country’s national security to prevent disclosure of state secrets, even to the point of dismissing a case entirely. See Totten v. United States, 92 U.S. 105, 107, 23 L.Ed. 605 (1876). The contemporary state secrets doctrine encompasses two applications of this principle. One completely bars adjudication of claims premised on state secrets (the “Totten bar”); the other is an evidentiary privilege (“the Reynolds privilege”) that excludes privileged evidence from the case and may result in dismissal of the claims.[3] See United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). We first address the nature of these applications and then apply them to the facts of this case.
A. The Totten Bar
In 1876 the Supreme Court stated “as a general principle [ ] that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential.” Totten, 92 U.S. at 107 (emphasis added). The Court again invoked the principle in 1953, citing Totten for the proposition that “where the very subject matter of the action” is “a matter of state secret,” an *1078 action may be “dismissed on the pleadings without ever reaching the question of evidence” because it is “so obvious that the action should never prevail over the privilege.” Reynolds, 345 U.S. at 11 n. 26, 73 S.Ct. 528. This application of Totten’s general principle — which we refer to as the Totten bar — is “designed not merely to defeat the asserted claims, but to preclude judicial inquiry” entirely. Tenet v. Doe, 544 U.S. 1, 7 n. 4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005).
The Court first applied this bar in Tot-ten itself, where the estate of a Civil War spy sued the United States for breaching an alleged agreement to compensate the spy for his wartime espionage services. Setting forth the “general principle” quoted above, the Court held that the action was barred because it was premised on the existence of a “contract for secret services with the government,” which was “a fact not to be disclosed.” Totten, 92 U.S. at 107.
A century later, the Court applied the Totten bar in Weinberger v. Catholic Action of Hawaii/Peace Education Project, 454 U.S. 139, 146 — 47, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981). There, the plaintiffs sued under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., to compel the Navy to prepare an environmental impact statement regarding a military facility where the Navy allegedly proposed to store nuclear weapons. The Court held that the allegations were “beyond judicial scrutiny” because, “[d]ue to national security reasons, ... the Navy can neither admit nor deny that it proposes to store nuclear weapons at [the facility].” Id. (citing Totten, 92 U.S. at 107).
The Court more recently reaffirmed and explained the Totten bar in a case involving two former Cold War spies who accused the CIA of reneging on a commitment to provide financial support in exchange for their espionage services. Relying on “Totten’s core concern” of “preventing the existence of the plaintiffs’ relationship with the Government from being revealed,” the Court held that the action was, like Totten and Weinberger, incapable of judicial review. Tenet, 544 U.S. at 8-10, 125 S.Ct. 1230.[4]
Plaintiffs contend that the Totten bar applies only to a narrow category of cases they say are not implicated here, namely claims premised on a plaintiffs espionage relationship with the government. We disagree. We read the Court’s discussion of Totten in Reynolds to mean that the Totten bar applies to eases in which “the very subject matter of the action” is “a matter of state secret.” Reynolds, 345 U.S. at 11, n.26, 73 S.Ct. 528. “[A] contract to perform espionage” is only an example. Id. This conclusion is confirmed by Weinberger, which relied on the Totten bar to hold that a case involving nuclear weapons secrets, and having nothing to do with espionage contracts, was “beyond judicial scrutiny.” See Weinberger, 454 U.S. at 146-47, 102 S.Ct. 197; see also Tenet, 544 U.S. at 9, 125 S.Ct. 1230 (characterizing Weinberger as a case applying the Totten bar). Thus, although the claims in both Totten and Tenet were premised on the existence of espionage agreements, and even though the plaintiffs in both Totten and Tenet were themselves parties to the espionage agreements, the Totten bar rests on a general principle *1079 that extends beyond that specific context. We therefore reject plaintiffs’ unduly narrow view of the Totten bar and reaffirm our holding in Al-Haramain that the bar “has evolved into the principle that where the very subject matter of a lawsuit is a matter of state secret, the action must be dismissed without reaching the question of evidence.” Al-Haramain, 507 F.3d at 1197. As we explain below, the Totten bar is a narrow rule, but it is not as narrow as plaintiffs contend.
We also disagree with plaintiffs’ related contention that the Totten bar cannot apply unless the plaintiff is a party to a secret agreement with the government. The environmental groups and individuals who were the plaintiffs in Weinberger were not parties to agreements with the United States, secret or otherwise. The purpose of the bar, moreover, is to prevent the revelation of state secrets harmful to national security, a concern no less pressing when the plaintiffs are strangers to the espionage agreement that their litigation threatens to reveal. Thus, even if plaintiffs were correct that the Totten bar is limited to eases premised on espionage agreements with the government, we would reject their contention that the bar is necessarily limited to cases in which the plaintiffs are themselves parties to those agreements.
B. The Reynolds Privilege
In addition to the Totten bar, the state secrets doctrine encompasses a “privilege against revealing military [or state] secrets, a privilege which is well established in the law of evidence.” Reynolds, 345 U.S. at 6-7, 73 S.Ct. 528.[5] A successful assertion of privilege under Reynolds will remove the privileged evidence from the litigation. Unlike the Totten bar, a valid claim of privilege under Reynolds does not automatically require dismissal of the case. In some instances, however, the assertion of privilege will require dismissal because it will become apparent during the Reynolds analysis that the case cannot proceed without privileged evidence, or that litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets.
Reynolds involved a military aircraft carrying secret electronic equipment. Id. at 3, 73 S.Ct. 528. After the plane crashed, the estates of three civilian observers killed in the accident brought tort claims against the government. In discovery, plaintiffs sought production of the AitForce’s official accident investigation report and the statements of three surviving crew members. The Air Force refused to produce the materials, citing the need to protect national security and military secrets. Id. at 4-5, 73 S.Ct. 528. The district court ordered the government to produce the documents in camera so the court could determine whether they contained privileged material. When the government refused, the court sanctioned the government by establishing the facts on the issue of negligence in plaintiffs’ favor. Id. at 5, 73 S.Ct. 528.
The Supreme Court reversed and sustained the government’s claim of privilege because “there was a reasonable danger that the accident investigation report would contain references to the secret electronic equipment which was the primary concern of the mission.” Id. at 10, 73 S.Ct. 528. The Court also provided guidance on how claims of privilege should be analyzed and held that, under the circumstances, the district court should have sustained the privilege without even requiring the government to produce the report for in camera review. Id. at 10-11, *1080 73 S.Ct. 528. The Court did not, however, dismiss the case outright. Rather, given that the secret electronic equipment was unrelated to the cause of the accident, it remanded to the district court, affording plaintiffs the opportunity to try to establish their claims without the privileged accident report and witness statements. Id. at 11, 73 S.Ct. 528.
Analyzing claims under the Reynolds privilege involves three steps:
First, we must “ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied.” Second, we must make an independent determination whether the information is privileged.... Finally, “the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim.”
Al-Haramain, 507 F.3d at 1202 (citation omitted) (quoting El-Masri v. United States, 479 F.3d 296, 304 (4th Cir.2007)). We discuss these steps in turn.

1. Procedural Requirements

a. Assertion of the privilege. “The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party.” Reynolds, 345 U.S. at 7, 73 S.Ct. 528 (footnotes omitted). The privilege “is not to be lightly invoked.” Id. This is especially true when, as in this case, the government seeks not merely to preclude the production of particular items of evidence (as in Reynolds) but to obtain dismissal of the entire action.
To ensure that the privilege is invoked no more often or extensively than necessary, Reynolds held that “[tjhere must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.” Id. at 7-8, 73 S.Ct. 528 (footnote omitted). This certification is fundamental to the government’s claim of privilege. As we have observed in a different context, the decision to invoke the privilege must “be a serious, considered judgment, not simply an administrative formality.” United States v. W.R. Grace, 526 F.3d 499, 507-08 (9th Cir.2008) (en banc). The formal claim must reflect the certifying official’s personal judgment; responsibility for this task may not be delegated to lesser-ranked officials. The claim also must be presented in sufficient detail for the court to make an independent determination of the validity of the claim of privilege and the scope of the evidence subject to the privilege.
In the present case, General Michael Hayden, then-Director of the CIA, asserted the initial, formal claim of privilege and submitted detailed public and classified declarations. We were informed at oral argument that the current Attorney General, Eric Holder, has also reviewed and approved the ongoing claim of privilege. Although Reynolds does not require review and approval by the Attorney General when a different agency head has control of the matter, such additional review by the executive branch’s chief lawyer is appropriate and to be encouraged.
b. Timing. Plaintiffs contend that the government’s assertion of privilege was premature, urging that the Reynolds privilege cannot be raised before an obligation to produce specific evidence subject to a claim of privilege has actually arisen. We disagree. The privilege may be asserted at any time, even at the pleading stage.
The privilege indisputably may be raised with respect to discovery requests seeking information the government contends is privileged. Courts have repeatedly sustained claims of privilege under those circumstances. See, e.g., Reynolds, 345 U.S. at 3, 73 S.Ct. 528 (document production requests); Kasza v. Browner, 133 F.3d 1159, 1170 (9th Cir. 1998) (various discovery requests); Halkin *1081 v. Helms, 690 F.2d 977, 985-87 (D.C.Cir. 1982) (interrogatories, document production requests and oral depositions). In addition, the government may raise the privilege to prevent the disclosure of privileged information in a responsive pleading, as it did in Ellsberg v. Mitchell, 709 F.2d 51, 54 & n.6 (D.C.Cir.1983), and Black v. United States, 62 F.3d 1115, 1117-19 (8th Cir.1995). See Huey v. Honeywell, Inc., 82 F.3d 327, 333 (9th Cir.1996) (explaining that the contents of an answer may be evidentiary); Lockwood v. Wolf Corp., 629 F.2d 603, 611 (9th Cir.1980) (holding that admissions in opposing parties’ pleadings are admissible as evidence).
We also conclude that the government may assert a Reynolds privilege claim prospectively, even at the pleading stage, rather than waiting for an evidentiary dispute to arise during discovery or trial. See, e.g., El-Masri, 479 F.3d at 308 (“[Dismissal at the pleading stage is appropriate if state secrets are so central to a proceeding that it cannot be litigated without threatening their disclosure.”); Black, 62 F.3d at 1117-19 (dismissing the action at the pleading stage based on the government’s assertion of privilege over certain categories of information concerning U.S. intelligence operations); Farnsworth Cannon, Inc. v. Grimes, 635 F.2d 268, 281(4th Cir.1980) (en banc) (per curiam); see also Al-Haramain, 507 F.3d at 1201 (recognizing that Reynolds may result in dismissal even without “await[ing] preliminary discovery”). In some cases, the court may be able to determine with certainty from the nature of the allegations and the government’s declarations in support of its claim of secrecy that litigation must be limited or cut off in order to protect state secrets, even before any discovery or evidentiary requests have been made. In such cases, waiting for specific evidentiary disputes to arise would be both unnecessary and potentially dangerous. See Sterling v. Tenet, 416 F.3d 338, 344 (4th Cir.2005) (“Courts are not required to play with fire and chance further disclosure — inadvertent, mistaken, or even intentional — that would defeat the very purpose for which the privilege exists.”). The showing the government must make to prevail on a claim of state secrets privilege may be especially difficult when attempted before any request for specific information or evidence has actually been made, but foreclosing the government from even trying to make that showing would be inconsistent with the need to protect state secrets.

2. The Court’s Independent Evaluation of the Claim of Privilege

When the privilege has been properly invoked, “we must make an independent determination whether the information is privileged.” Al-Haramain, 507 F.3d at 1202. The court must sustain a claim of privilege when it is satisfied, “from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose ... matters which, in the interest of national security, should not be divulged.” Reynolds, 345 U.S. at 10, 73 S.Ct. 528. If this standard is met, the evidence is absolutely privileged, irrespective of the plaintiffs’ countervailing need for it. See id. at 11, 73 S.Ct. 528 (“[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that [state] secrets are at stake.”); Halkin, 690 F.2d at 990.
This step in the Reynolds analysis “places on the court a special burden to assure itself that an appropriate balance is struck between protecting national security matters and preserving an open court system.” Al-Haramain, 507 F.3d at 1203. In evaluating the need for secrecy, “we acknowledge the need to defer to the Executive on matters of foreign policy and *1082 national security and surely cannot legitimately find ourselves second guessing the Executive in this arena.” Id. But “the state secrets doctrine does not represent a surrender of judicial control over access to the courts.” El-Masri, 479 F.3d at 312. Rather, “to ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary, it is essential that the courts continue critically to examine instances of its invocation.” Ellsberg, 709 F.2d at 58. “We take very seriously our obligation to review the[government’s claims] with a very careful, indeed a skeptical, eye, and not to accept at face value the government’s claim or justification of privilege,” Al-Haramain, 507 F.3d at 1203, though we must “do so without forcing a disclosure of the very thing the privilege is designed to protect____ Too much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses.” Reynolds, 345 U.S. at 8, 73 S.Ct. 528.
We do not offer a detailed definition of what constitutes a state secret. The Supreme Court in Reynolds found it sufficient to say that the privilege covers “matters which, in the interest of national security, should not be divulged.” Id. at 10, 73 S.Ct. 528. We do note, however, that an executive decision to classify information is insufficient to establish that the infoimation is privileged. See Ellsberg, 709 F.2d at 57 (“[T]he privilege may not be used to shield any material not strictly necessary to prevent injury to national security.”). Although classification may be an indication of the need for secrecy, treating it as conclusive would trivialize the court’s role, which the Supreme Court has clearly admonished “cannot be abdicated to the caprice of executive officers.” Reynolds, 345 U.S. at 9-10, 73 S.Ct. 528.

3. How Should the Matter Proceed?

When a court sustains a claim of privilege, it must then resolve “ ‘how the matter should proceed in light of the successful privilege claim.’ ” Al-Haramain, 507 F.3d at 1202 (quoting El-Masri, 479 F.3d at 304). The court must assess whether it is feasible for the litigation to proceed without the protected evidence and, if so, how.
When the government successfully invokes the state secrets privilege, “the evidence is completely removed from the case.” Kasza, 133 F.3d at 1166. “ ‘[W]henever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter.’ ” Id. (quoting Ellsberg, 709 F.2d at 57). However, there will be occasions when, as a practical matter, secret and nonsecret information cannot be separated. In some cases, therefore, “it is appropriate that the courts restrict the parties’ access not only to evidence which itself risks the disclosure of a state secret, but also those pieces of evidence or areas of questioning which press so closely upon highly sensitive material that they create a high risk of inadvertent or indirect disclosures.” Bareford v. Gen. Dynamics Corp., 973 F.2d 1138, 1143-44 (5th Cir.1992); see also Kasza, 133 F.3d at 1166 (“[I]f seemingly innocuous information is part of a ... mosaic, the state secrets privilege may be invoked to bar its disclosure and the court cannot order the government to disentangle this information from other [i.e., secret] information.”).
Ordinarily, simply excluding or otherwise walling off the privileged information may suffice to protect the state secrets and “ ‘the case will proceed accordingly, with no consequences save those resulting from the loss of evidence.’ ” Al-Haramain, 507 F.3d at 1204 (quoting Ellsberg, 709 F.2d at 64); see, e.g., Webster v. Doe, 486 U.S. 592, 604-05, 108 S.Ct. 2047, 100 L.Ed.2d 632 *1083 (1988) (permitting case to continue without privileged evidence); Reynolds, 345 U.S. at 11-12, 73 S.Ct. 528 (same).
In some instances, however, application of the privilege may require dismissal of the action. When this point is reached, the Reynolds privilege converges with the Totten bar, because both require dismissal. There are three circumstances when the Reynolds privilege would justify terminating a case.
First, if “the plaintiff cannot prove the prima facie elements of her claim with nonprivileged evidence, then the court may dismiss her claim as it would with any plaintiff who cannot prove her case.” Kasza, 133 F.3d at 1166; see also Ellsberg, 709 F.2d at 65. Second, “ ‘if the privilege deprives the defendant of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant.’ ” Kasza, 133 F.3d at 1166 (quoting Bareford, 973 F.2d at 1141); accord In re Sealed Case, 494 F.3d 139, 153 (D.C.Cir.2007); see also, e.g., Tenenbaum v. Simonini, 372 F.3d 776, 777 (6th Cir. 2004).
Third, and relevant here, even if the claims and defenses might theoretically be established without relying on privileged evidence, it may be impossible to proceed with the litigation because — privileged evidence being inseparable from nonprivileged information that will be necessary to the claims or defenses — litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets. See, e.g., In re Sealed Case, 494 F.3d at 153 (“If the district court determines that the subject matter of a case is so sensitive that there is no way it can be litigated without risking national secrets, then the case must be dismissed.”); El-Masri 479 F.3d at 308 (“[A] proceeding in which the state secrets privilege is successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information’s disclosure.”); Bareford, 973 F.2d at 1144 (“We are compelled to conclude that the trial of this case would inevitably lead to a significant risk that highly sensitive information concerning this defense system would be disclosed.”); Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236, 1241-42 (4th Cir.1985) (“[I]n some circumstances sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters.”); Farnsworth Cannon, 635 F.2d at 281 (dismissing the action at the outset because “any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation”); id. at 279-80 (Phillips, J., specially concurring and dissenting from the three-judge panel decision) (concluding that “litigation should be entirely foreclosed at the outset by dismissal of the action” if it appears that “the danger of inadvertent compromise of the protected state secrets outweighs the public and private interests in attempting formally to resolve the dispute while honoring the privilege”). As we shall explain, this circumstance exists here and requires dismissal.
IV. Application
We therefore turn to the application of the state secrets doctrine in this case. The government contends that plaintiffs’ lawsuit should be dismissed, whether under the Totten bar or the Reynolds privilege, because “state secrets are so central to this ease that permitting further proceeding[s] would create an intolerable risk of disclosure that would jeopardize nation *1084 al security.” U.S. Br. 13.[6] Plaintiffs argue that the Totten bar does not apply and that, even if the government is entitled to some protection under the Reynolds privilege, at least some claims survive. The district court appears to have dismissed the action under the Totten bar, making a “threshold determination” that “the very subject matter of the case is a state secret.” Having dismissed on that basis, the district court did not address whether application of the Reynolds privilege would require dismissal.
We do not find it quite so clear that the very subject matter of this case is a state secret. Nonetheless, having conducted our own detailed analysis, we conclude that the district court reached the correct result because dismissal is warranted even under Reynolds. Recognizing the serious consequences to plaintiffs of dismissal, we explain our ruling so far as possible within the considerable constraints imposed on us by the state secrets doctrine itself.
A. The Totten Bar
The categorical, “absolute protection [the Court] found necessary in enunciating the Totten rule” is appropriate only in narrow circumstances. Tenet, 544 U.S. at 11, 125 S.Ct. 1230. The Totten bar applies only when the “very subject matter” of the action is a state secret — i.e., when it is “obvious” without conducting the detailed analysis required by Reynolds “that the action [c]ould never prevail over the privilege.” Reynolds, 345 U.S. at 11 n.26, 73 S. Ct. 528. The Court has applied the Tot-ten bar on just three occasions, involving two different kinds of state secrets: In Tenet and Totten the Court applied the Totten bar to “the distinct class of cases that depend upon clandestine spy relationships,” see Tenet, 544 U.S. at 9-10, 125 S.Ct. 1230; Totten, 92 U.S. at 107, and in Weinberger the Court applied the Totten bar to a case that depended on whether the Navy proposed to store nuclear weapons at a particular facility, see Weinberger, 454 U.S. at 146-47, 102 S.Ct. 197. Although the Court has not limited the Tot-ten bar to cases premised on secret espionage agreements or the location of nuclear weapons, neither has it offered much guidance on when the Totten bar applies beyond these limited circumstances. Because the Totten bar is rarely applied and not clearly defined, because it is a judge-made doctrine with extremely harsh consequences and because conducting a more detailed analysis will tend to improve the accuracy, transparency and legitimacy of the proceedings, district courts presented with disputes about state secrets should ordinarily undertake a detailed Reynolds analysis before deciding whether dismissal on the pleadings is justified.
Here, some of plaintiffs’ claims might well fall within the Totten bar. In particular, their allegations that Jeppesen conspired with agents of the United States in plaintiffs’ forced disappearance, torture and degrading treatment are premised on the existence of an alleged covert relationship between Jeppesen and the government — a matter that the Fourth Circuit has concluded is “practically indistinguishable from that categorically barred by Tot-ten and Tenet.” El-Masri, 479 F.3d at 309.[7] On the other hand, allegations based *1085 on plaintiffs’ theory that Jeppesen should be liable simply for what it “should have known” about the alleged unlawful extraordinary rendition program while participating in it are not so obviously tied to proof of a secret agreement between Jeppesen and the government.
We do not resolve the difficult question of precisely which claims may be barred under Totten because application of the Reynolds privilege leads us to conclude that this litigation cannot proceed further. We rely on the Reynolds privilege rather than the Totten bar for several reasons. First, the government has asserted the Reynolds privilege along with the Totten bar, inviting the further inquiry Reynolds requires and presenting a record that compels dismissal even on this alternate ground. Second, we have discretion to affirm on any basis supported by the record. See Thigpen v. Roberts, 468 U.S. 27, 29-30, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir.2008). Third, resolving this case under Reynolds avoids difficult questions about the precise scope of the Totten bar and permits us to conduct a searching judicial review, fulfilling our obligation under Reynolds “to review the [government’s claim] with a very careful, indeed a skeptical, eye, and not to accept at face value the government’s claim or justification of privilege.” Al-Haramain, 507 F.3d at 1203.[8]
B. The Reynolds Privilege
There is no dispute that the government has complied with Reynolds ’ procedural requirements for invoking the state secrets privilege by filing General Hayden’s formal claim of privilege in his public declaration.[9] We therefore focus on the second and third steps in the Reynolds analysis; First, whether and to what extent the matters the government contends must be kept secret are in fact matters of state secret; and second, if they are, whether the action can be litigated without relying on evidence that would necessarily reveal those secrets or press so closely upon them as to create an unjustifiable risk that they would be revealed. In doing so, we explain our decision as much as we can without compromising the secrets we are required to protect.

*1086
1. Whether and to What Extent the Evidence Is Privileged

The government asserts the state secrets privilege over four categories of evidence. In particular, the government contends that neither it nor Jeppesen should be compelled, through a responsive pleading, discovery responses or otherwise, to disclose: “[1] information that would tend to confirm or deny whether Jeppesen or any other private entity assisted the CIA with clandestine intelligence activities; [2] information about whether any foreign government cooperated with the CIA in clandestine intelligence activities; [3] information about the scope or operation of the CIA terrorist detention and interrogation program; [or 4] any other information concerning CIA clandestine intelligence operations that would tend to reveal intelligence activities, sources, or methods.” U.S. Br. 7-8. These indisputably are matters that the state secrets privilege may cover. See, e.g., Tenet, 544 U.S. at 11, 125 S.Ct. 1230 (emphasizing the “absolute protection” the state secrets doctrine affords against revealing espionage relationships); CIA v. Sims, 471 U.S. 159, 175, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985) (“Even a small chance that some court will order disclosure of a source’s identity could well impair intelligence gathering and cause sources to ‘close up like a clam.’ ”); In re Sealed Case, 494 F.3d at 152 (prohibiting “all discussion of intelligence sources, capabilities, and the like”); Al-Haramain, 507 F.3d at 1204 (applying the privilege to “the means, sources and methods of intelligence gathering”); Ellsberg, 709 F.2d at 57 (applying the privilege to the “disclosure of intelligence-gathering methods or capabilities”).
We have thoroughly and critically reviewed the government’s public and classified declarations and are convinced that at least some of the matters it seeks to protect from disclosure in this litigation are valid state secrets, “which, in the interest of national security, should not be divulged.” Reynolds, 345 U.S. at 10, 73 S.Ct. 528. The government’s classified disclosures to the court are persuasive that compelled or inadvertent disclosure of such information in the course of litigation would seriously harm legitimate national security interests. In fact, every judge who has reviewed the government’s formal, classified claim of privilege in this case agrees that in this sense the claim of privilege is proper, although we have different views as to the scope of the privilege and its impact on plaintiffs’ case. The plaintiffs themselves “do not dispute that, during the course of litigation, there may well be relevant evidence that may be properly withheld pursuant to the privilege.” Br. of Plaintiffs-Appellants 26. See El-Masri, 479 F.3d at 308-13 (affirming the dismissal of a case involving essentially the same types of claims on the basis of the states secrets doctrine).
We are precluded from explaining precisely which matters the privilege covers lest we jeopardize the secrets we are bound to protect. See Black, 62 F.3d at 1119 (“Care in protecting state secrets is necessary not only during a court’s review of the evidence, but in its subsequent treatment of the question in any holding; a properly phrased opinion should not strip the veil from state secrets even if ambiguity results in a loss of focus and clarity.”). We can say, however, that the secrets fall within one or more of the four categories identified by the government and that we have independently and critically confirmed that their disclosure could be expected to cause significant harm to national security.

2. Effect on the Proceedings

Having determined that the privilege applies, we next determine whether the case must be dismissed under the Reyn *1087 olds privilege.[10] We have thoroughly considered plaintiffs’ claims, several possible defenses and the prospective path of this litigation. We also have carefully and skeptically reviewed the government’s classified submissions, which include supplemental information not presented to the district court. We rely heavily on these submissions, which describe the state secrets implicated here, the harm to national security that the government believes would result from explicit or implicit disclosure and the reasons why, in the government’s view, further litigation would risk that disclosure.
Given plaintiffs’ extensive submission of public documents and the stage of the litigation, we do not rely on the first two circumstances in which the Reynolds privilege requires dismissal — that is, whether plaintiffs could prove a prima facie case without privileged evidence, or whether the privilege deprives Jeppesen of evidence that would otherwise give it a valid defense to plaintiffs’ claims. See Kasza, 133 F.3d at 1166; supra Part III.B.3.[11] Instead, we assume without deciding that plaintiffs’ prima facie case and Jeppesen’s defenses may not inevitably depend on privileged evidence. Proceeding on that assumption, we hold that dismissal is nonetheless required under Reynolds because there is no feasible way to litigate Jeppesen’s alleged liability without creating an unjustifiable risk of divulging state secrets. See El-Masri, 479 F.3d at 312 (coming to the same conclusion in a related and comparable case), cert. denied, 552 U.S. 947, 128 S.Ct. 373, 169 L.Ed.2d 258 (2007).[12]
*1088 We reach this conclusion because all seven of plaintiffs’ claims, even if taken as true, describe Jeppesen as providing logistical support in a broad, complex process, certain aspects of which, the government has persuaded us, are absolutely protected by the state secrets privilege. Notwithstanding that some information about that process has become public, Jeppesen’s alleged role and its attendant liability cannot be isolated from aspects that are secret and protected. Because the facts underlying plaintiffs’ claims are so infused with these secrets, any plausible effort by Jeppesen to defend against them would create an unjustifiable risk of revealing state secrets, even if plaintiffs could make a prima facie case on one or more claims with nonprivileged evidence. See Kasza, 133 F.3d at 1170; Black, 62 F.3d at 1118 (“[Pjroof of ‘the factual allegations in the Amended Complaint are so tied to the privileged information that further litigation will constitute an undue threat that privileged information will be disclosed.’ ”) (quoting and affirming the district court); Bareford, 973 F.2d at 1144 (“[T]he danger that witnesses might divulge some privileged material during cross-examination is great because the privileged and non-privileged material are inextricably linked. We are compelled to conclude that the trial of this case would inevitably lead to a significant risk that highly sensitive information concerning this defense system would be disclosed.”); Fitzgerald, 776 F.2d at 1243 (“In examining witnesses with personal knowledge of relevant military secrets, the parties would have every incentive to probe dangerously close to the state secrets themselves. In these circumstances, state secrets could be compromised even without direct disclosure by a witness.”); Farnsworth Cannon, 635 F.2d at 281 (“[T]he plaintiff and its lawyers would have every incentive to probe as close to the core secrets as the trial judge would permit. Such probing in open court would inevitably be revealing. It is evident that any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state *1089 secrets precludes any further attempt to pursue this litigation.”); see also In re Sealed Case, 494 F.3d at 152-54 (acknowledging the appropriateness of dismissal when unprivileged and privileged matters are so entwined that the risk of disclosure of privileged material is unacceptably high, although concluding that the case before the court did not fall within that category).
Here, further litigation presents an unacceptable risk of disclosure of state secrets no matter what legal or factual theories Jeppesen would choose to advance during a defense. Whether or not Jeppesen provided logistical support in connection with the extraordinary rendition and interrogation programs, there is precious little Jeppesen could say about its relevant conduct and knowledge without revealing information about how the United States government does or does not conduct covert operations. Our conclusion holds no matter what protective procedures the district court might employ. Adversarial litigation, including pretrial discovery of documents and witnesses and the presentation of documents and testimony at trial, is inherently complex and unpredictable. Although district courts are well equipped to wall off isolated secrets from disclosure, the challenge is exponentially greater in exceptional cases like this one, where the relevant secrets are difficult or impossible to isolate and even efforts to define a boundary between privileged and unprivileged evidence would risk disclosure by implication. In these rare circumstances, the risk of disclosure that further proceedings would create cannot be averted through the use of devices such as protective orders or restrictions on testimony.
Dismissal at the pleading stage under Reynolds is a drastic result and should not be readily granted. We are not persuaded, however, by the dissent’s views that the state secrets privilege can never be “asserted during the pleading stage to excise entire allegations,” or that the government must be required “to make its claims of state secrets with regard to specific items of evidence or groups of such items as their use is sought in the lawsuit.” Dissent at 1094,1097.
A case may fall outside the Totten bar and yet it may become clear during the Reynolds analysis that dismissal is required at the outset. See Al-Haramain, 507 F.3d at 1201 (explaining that the Tot-ten bar and the Reynolds privilege form a “continuum of analysis,” and that in some cases “the suit itself may not be barred because of its subject matter and yet ultimately, the state secrets privilege may nonetheless preclude the case from proceeding to the merits,” even without “await[ing] preliminary discovery”). Here, our detailed Reynolds analysis reveals that the claims and possible defenses are so infused with state secrets that the risk of disclosing them is both apparent and inevitable. Dismissal under these circumstances, like dismissal under the Totten bar, reflects the general principle that “public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated.” Totten, 92 U.S. at 107.
Although we are necessarily precluded from explaining precisely why this case cannot be litigated without risking disclosure of state secrets, or the nature of the harm to national security that we are convinced would result from further litigation, we are able to offer a few observations.
First, we recognize that plaintiffs have proffered hundreds of pages of publicly available documents, many catalogued in the dissent’s Appendix, that they say corroborate some of their allegations con *1090 cerning Jeppesen’s alleged participation in aspects of the extraordinary rendition program. As the government has acknowledged, its claim of privilege does not extend to public documents. Accordingly, we do not hold that any of the documents plaintiffs have submitted are subject to the privilege; rather, we conclude that even assuming plaintiffs could establish their entire case solely through nonprivileged evidence — unlikely as that may be— any effort by Jeppesen to defend would unjustifiably risk disclosure of state secrets. Cf. El-Masri, 479 F.3d at 309 (concluding that “virtually any conceivable response [by government defendants to claims based on factual allegations materially identical to this case’s] ... would disclose privileged information”).
Second, we do not hold that the existence of the extraordinary rendition program is itself a state secret. The program has been publicly acknowledged by numerous government officials including the President of the United States. Even if its mere existence may once have been a “matter[ ] which, in the interest of national security, should not be divulged,” it is not a state secret now. Reynolds, 345 U.S. at 10, 73 S.Ct. 528; cf. Al-Haramain, 507 F.3d at 1193 (concluding “[i]n light of extensive government disclosures” that a warrantless wiretapping program was not a matter of state secret). Nonetheless, partial disclosure of the existence and even some aspects of the extraordinary rendition program does not preclude other details from remaining state secrets if their disclosure would risk grave harm to national security. See Al-Haramain, 507 F.3d at 1203 (concluding that some undisclosed details of the wiretapping program were entitled to protection under the state secrets privilege); Halkin, 690 F.2d at 994 (“We reject, as we have previously, the theory that ‘because some information about the project ostensibly is now in the public domain, nothing about the project in which the appellants have expressed an interest can properly remain classified’ or otherwise privileged from disclosure.” (quoting Military Audit Project v. Casey, 656 F.2d 724, 752(D.C.Cir.l981))); see also Bareford, 973 F.2d at 1144 (explaining that in some circumstances, “disclosure of information by government officials can be prejudicial to government interests, even if the information has already been divulged from non-government sources”).
Third, we acknowledge the government’s certification at oral argument that its assertion of the state secrets privilege comports with the revised standards set forth in the current administration’s September 23, 2009 memorandum, adopted several years after the government first invoked the privilege in this case. Those standards require the responsible agency to show that “assertion of the privilege is necessary to protect information the unauthorized disclosure of which reasonably could be expected to cause significant harm to the national defense or foreign relations.” Holder Memo, supra, at 1. They also mandate that the Department of Justice “will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain competition; or (iv) prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security.” Id. at 2. That certification here is consistent with our independent conclusion, having reviewed the government’s public and classified declarations, that the government is not invoking the privilege to avoid embarrassment or to escape scrutiny of its recent controversial transfer and interrogation policies, rather than to protect legitimate national security concerns.
*1091 V. Other Remedies
Our holding today is not intended to foreclose — or to pre-judge — possible nonjudicial relief, should it be warranted for any of the plaintiffs. Denial of a judicial forum based on the state secrets doctrine poses concerns at both individual and structural levels. For the individual plaintiffs in this action, our decision forecloses at least one set of judicial remedies, and deprives them of the opportunity to prove their alleged mistreatment and obtain damages. At a structural level, terminating the case eliminates further judicial review in this civil litigation, one important check on alleged abuse by government officials and putative contractors. Other remedies may partially mitigate these concerns, however, although we recognize each of these options brings with it its own set of concerns and uncertainties.
First, that the judicial branch may have deferred to the executive branch’s claim of privilege in the interest of national security does not preclude the government from honoring the fundamental principles of justice. The government, having access to the secret information, can determine whether plaintiffs’ claims have merit and whether misjudgments or mistakes were made that violated plaintiffs’ human rights. Should that be the case, the government may be able to find ways to remedy such alleged harms while still maintaining the secrecy national security demands. For instance, the government made reparations to Japanese Latin Americans abducted from Latin America for internment in the United States during World War II. See Mochizuki v. United States, 43 Fed.Cl. 97 (1999).[13]
Second, Congress has the authority to investigate alleged wrongdoing and restrain excesses by the executive branch.[14] “The power of the Congress to conduct investigations is inherent in the legislative process.” Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); accord Eastland v. U.S. Servicemen’s Fund, 421 U.S. 491, 504, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). “Congress unquestionably has ... broad authority to investigate, to inform the public, and, ultimately, to legislate against suspected corruption and abuse of power in the Executive Branch.” Nixon v. Adm’r of Gen. Servs., 433 U.S. 425, 498, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (Powell, J., concurring); see also Branzburg v. Hayes, 408 U.S. 665, 741, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (Stewart, J., dissenting) (“We have long recognized the value of the role played by legislative investigations .... ”).
Third, Congress also has the power to enact private bills. See Nixon v. Fitzgerald, 457 U.S. 731, 762 n. 5, 102 S.Ct. 2690, *1092 73 L.Ed.2d 349 (1982) (Burger, C.J., concurring) (“For uncompensated injuries Congress may in its discretion provide separate nonjudicial remedies such as private bills.”); Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 239 n.9, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (“Private bills in Congress are still common, and were even more so in the days before establishment of the Claims Court.”); Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 431, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (“Congress continues to employ private legislation to provide remedies in individual cases of hardship.”). Because as a general matter the federal courts are better equipped to handle claims, see Kosak v. United States, 465 U.S. 848, 867-69, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984) (Stevens, J., dissenting), Congress can refer the case to the Court of Federal Claims to make a recommendation before deciding whether to enact a private bill, see 28 U.S.C. § 1492; see also Banfi Prods. Corp. v. United States, 40 Fed.Cl. 107, 109 (1997), although Congress alone will make the ultimate decision. When national security interests deny alleged victims of wrongful governmental action meaningful access to a judicial forum, private bills may be an appropriate alternative remedy.[15]
Fourth, Congress has the authority to enact remedial legislation authorizing appropriate causes of action and procedures to address claims like those presented here. When the state secrets doctrine “compels the subordination of appellants’ interest in the pursuit of their claims to the executive’s duty to preserve our national security, this means that remedies for ... violations that cannot be proven under existing legal standards, if there are to be such remedies, must be provided by Congress. That is where the government’s power to remedy wrongs is ultimately reposed.” Halkin v. Helms, 690 F.2d at 1001 (footnote omitted).
VI. Conclusion
We, like the dissent, emphasize that it should be a rare case when the state secrets doctrine leads to dismissal at the outset of a case. Nonetheless, there are such cases — not just those subject to Tot-ten’s per se rule, but those where the mandate for dismissal is apparent even under the more searching examination required by Reynolds. This is one of those rare cases.
For all the reasons the dissent articulates — including the impact on human rights, the importance of constitutional protections and the constraints of a judge-made doctrine — we do not reach our decision lightly or without close and skeptical scrutiny of the record and the government’s case for secrecy and dismissal. We expect our decision today to inform district courts that Totten has its limits, that every effort should be made to parse claims to salvage a case like this using the Reynolds approach, that the standards for peremptory dismissal are very high and it is the *1093 district court’s role to use its fact-finding and other tools to full advantage before it concludes that the rare step of dismissal is justified. We also acknowledge that this case presents a painful conflict between human rights and national security. As judges, we have tried our best to evaluate the competing claims of plaintiffs and the government and resolve that conflict according to the principles governing the state secrets doctrine set forth by the United States Supreme Court.
For the reasons stated, we hold that the government’s valid assertion of the state secrets privilege warrants dismissal of the litigation, and affirm the judgment of the district court.[16] The government shall bear all parties’ costs on appeal.
AFFIRMED.

. Mohamed's allegations have been discussed in other litigation in both the United States and the United Kingdom. See Mohammed v. Obama, 689 F.Supp.2d 38 (D.D.C.2009); R (Mohamed.) v. Secretary of State for Foreign and Commonwealth Affairs, [2010] EWCA (Civ) 65 (decision of the United Kingdom Court of Appeal).

. Among the materials plaintiffs filed in opposition to the government's motion to dismiss is a former Jeppesen employee’s declaration, which plaintiffs assert demonstrates this knowledge. See Dissent at 1095 n.3.

. Were this a criminal case, the state secrets doctrine would apply more narrowly. See El-Masri v. United States, 479 F.3d 296, 313 n. 7 (4th Cir.2007) (“[T]he Executive’s authority to protect [state secrets] is much broader in civil matters than in criminal prosecutions.”); see also Reynolds, 345 U.S. at 12, 73 S.Ct. 528.

. Tenet also made clear that application of the Totten bar does not require a formal assertion of the state secrets privilege by the government that meets the procedural requirements explained in Reynolds and discussed below. See Tenet, 544 U.S. at 8-9, 125 S.Ct. 1230 (applying the Totten bar); Doe v. Tenet, 329 F.3d 1135, 1151-52 (9th Cir.2003) (underlying appellate decision noting that no formal assertion had yet been filed).

. The two applications of the doctrine remain distinct; Reynolds "in no way signaled [a] retreat from Totten’s broader holding." Tenet, 544 U.S. at 9, 125 S.Ct. 1230.

. The government’s classified briefing and supporting declarations provide more specific support for the government’s state secrets contentions. This information is crucial to our decision. See El-Masri, 479 F.3d at 312.

. We do not decide whether any of plaintiffs’ claims are cognizable under the Alien Tort Statute ("ATS”). But assuming that the conspiracy claims are cognizable, they require proof of an agreement. See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 260 (2d Cir.2009) (holding that conspiracy liability under the ATS would require either an "agreement” or " 'a criminal *1085 intention to participate in a common criminal design' ") (quoting Prosecutor v. Tadic, Case No. IT-94-1-A, Appeal Judgment, ¶ 206 (July 15, 1999)); Cabello v. Fernandez-Larios, 402 F.3d 1148, 1159 (11th Cir.2005) (holding that conspiracy liability under the ATS requires proof that "two or more persons agreed to commit a wrongful act”). Plaintiffs’ allegations confirm that their conspiracy claims depend on proof of a covert relationship. See, e.g., First Am. Compl. ¶ 255 ("Jeppesen entered into an agreement with agents of the United States to unlawfully render Plaintiffs to secret detention in Morocco, Egypt, and Afghanistan.”); ¿¿.¶ 262 ("Defendant entered into an agreement with agents of the United States to provide flight and logistical support services to aircraft and crew used in the extraordinary rendition program to unlawfully render Plaintiffs to detention and interrogation in Morocco, Egypt, and Afghanistan, where they would be subjected to acts of torture and other cruel, inhuman or degrading treatment.”).

. This skepticism is all the more justified in cases that allege serious government wrongdoing. Such allegations heighten the risk that government officials may be motivated to invoke the state secrets doctrine not only by their obligation to protect national security but also by a desire to protect themselves or their associates from scrutiny.

. As previously noted, the government filed declarations meeting the procedural requirements for the Reynolds privilege even though such declarations are not strictly necessary to support a Totten claim. See Tenet, 544 U.S. at 11, 125 S.Ct. 1230.

. As noted earlier, the district court did not conduct a detailed analysis of plaintiffs’ several claims because it concluded that the subject matter of the entire case is a state secret and therefore dismissed under the Totten bar. One option, vigorously urged by the dissent, would be to remand to the district court for that court to conduct a more detailed analysis in the first instance. As the case has developed during these en banc proceedings, however, we find remand unnecessary because our own Reynolds analysis persuades us that the litigation cannot proceed. Although it would have been preferable for the district court to conduct this analysis first, we now have had to do it ourselves and it makes no sense to suspend our own judgment that— given the record before us and the nature of plaintiffs’ claims — this case realistically cannot be litigated against Jeppesen without compromising state secrets. There is thus no point, and much risk, in remanding to the district court to go through the Reynolds analysis as the dissent would prefer. We accept and respect the principles that motivate the dissent, but those principles do not justify prolonging the process here.

. As noted before, see supra n. 7 and related text, at least some of plaintiffs' claims would require proof of an agreement or covert relationship between the government and Jeppesen. These claims might well be barred under Totten and certainly would fall even under a Reynolds analysis. The dissent, however, suggests that plaintiffs could establish a prima facie case for at least two of their claims without relying on privileged evidence and perhaps without any discovery at all — namely, that Jeppesen recklessly provided flight and logistical support for rendition flights while it knew or should have known its support was being used for forced disappearance and torture. See Dissent Appendix. Although our holding does not require us to resolve this question, we are not so sure. Plaintiffs' reliance on information set forth in the dissent’s Appendix would have to overcome evidentiary and other obstacles, such as hearsay problems and the fact that the vast majority of the media reports cited as putting Jeppesen on notice were published after Jeppesen's services were alleged to have occurred. In any event, our own analysis under the third aspect of Reynolds persuades us these "knew or should have known” claims must be dismissed as well.

. In El-Masri, the Supreme Court declined to review the Fourth Circuit's dismissal of similar claims against the various United States government and corporate actors alleged to be more directly responsible for the rendition and interrogation programs at issue here. Nothing in the Supreme Court's state secrets jurisprudence suggests that plaintiffs' claims here, against an alleged provider of *1088 logistical support to those programs, should proceed where claims against the government and corporate actors who plaintiffs allege were primarily responsible failed.
As the dissent correctly notes, we have previously disapproved of El-Masri for conflating the Totten bar's "very subject matter” inquiry with the Reynolds privilege. See Al-Haramain, 507 F.3d at 1201. We adhere to that approach today by maintaining a distinction between the Totten bar on the one hand and the Reynolds privilege on the other. See Tenet, 544 U.S. at 9, 125 S.Ct. 1230 (explaining that Reynolds "in no way signaled our retreat from Totten's broader holding that lawsuits premised on alleged espionage agreements are altogether forbidden”). Maintaining that distinction, how ever, does not mean that the Reynolds privilege can never be raised prospectively or result in a dismissal at the pleading stage. As we explained in Al-Haramain (as do we in the text), the Totten bar and the Reynolds privilege form a "continuum of analysis.” 507 F.3d at 1201. A case may fall outside the Totten bar because its "very subject matter” is not a state secret, and yet it may become clear in conducting a Reynolds analysis that plaintiffs cannot establish a prima facie case, that defendants are deprived of a valid defense or that the case cannot be litigated without presenting either a certainty or an unacceptable risk of revealing state secrets. When that point is reached, including, if applicable, at the pleading stage, dismissal is appropriate under tire Reynolds privilege. Notwithstanding its erroneous conflation of the Totten bar and the Reynolds privilege, we rely on El-Masri because it properly concluded — with respect to allegations comparable to those here — that "virtually any conceivable response to [plaintiffs’] allegations would disclose privileged information,” and, therefore, that the action could not be litigated "without threatening the disclosure” of state secrets. El-Masri, 479 F.3d at 308, 310.

. Other governments have committed to doing this. See, e.g., Prime Minister David Cameron, A Statement Given by the Prime Minister to the House of Commons on the Treatment of Terror Suspects (July 6, 2010), http://www.numberlO.gov.uk/news/ statements-and-articles/2010/07/statement-on-detainees-52943 ("[W]e are committed to mediation with those who have brought civil claims about their detention in Guantanamo. And wherever appropriate, we will offer compensation.”).

. In addition, Congress has constituted independent investigatory bodies within the executive branch. See, e.g., 50 U.S.C. § 403q (establishing the Office of Inspector General in the Central Intelligence Agency “to initiate and conduct independently inspections, investigations, and audits relating to programs and operations of the Agency”); see also Office of Inspector General, Central Intelligence Agency, Special Review: Counterterrorism Detention and Interrogation Activities (September 2001-October 2003), May 7, 2004 (partially redacted), available at http://grapb.ics8. nytimes.com/packages/pdf/politics/20090825DETAIN/2004CIAIG.pdf.

. Proceedings in the Court of Federal Claims following congressional referral may pose some of the same problems that require dismissal here — the Court of Federal Claims must avoid disclosure of state secrets too. The referral proceedings might be less problematic than this lawsuit, however, because, for example, the question of third-party liability would not be the focus: a private bill addresses compensation by the government, not by third parties. In addition, Congress might tailor its referral to protect state secrets, by, for example, requiring the Court of Federal Claims to make its recommendation based solely on the plaintiffs' own testimony and nonprivileged documents in the public domain. Moreover, Congress presumably possesses the power to restrict application of the state secrets privilege in the referral proceedings. Cf. Al-Haramain, 507 F.3d at 1205-06 (remanding to the district court to consider whether the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1806(f), preempts the state secrets privilege).

. We do not share the dissent’s confidence that the present proceedings come within Federal Rule of Civil Procedure 12(b)(6). Dissent 1093-95, 1097. Reynolds necessarily entails consideration of materials outside the pleadings: at minimum, the Reynolds analysis requires the court to review the government's formal claim of privilege. That fact alone calls into question reliance on Rule 12(b)(6). See Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir.2001).

. Abuse of the Nation's information classification system is not unheard of. Former U.S. Solicitor General Erwin Griswold, who argued the government’s case in the Pentagon Papers matter, later explained in a Washington Post editorial that "[i]t quickly becomes apparent to any person who has considerable experience with classified material that there is massive overclassification, and that the principal concern of the classifiers is not with national security, but rather with governmental embarrassment of one sort or another.” Erwin N. Griswold, Secrets Not Worth Keeping: the Courts and Classified Information, Wash. Post, Feb. 15, 1989, at A25.
Former Attorney General Herbert Brownell similarly complained in a 1953 letter to President Eisenhower that classification procedures were then "so broadly drawn and loosely administered as to make it possible for government officials to cover up their own mistakes and even their wrongdoing under the guise of protecting national security.” Letter from Attorney General Herbert Brownell to President Dwight Eisenhower (June 15, 1953) (quoted in Kenneth R. Mayer, With the Stroke of a Pen: Executive Orders and Presidential Power 145 (2001)).
Even in Reynolds, avoidance of embarrassment — not preservation of state secrets — appears to have motivated the Executive's invocation of the privilege. There the Court credited the government’s assertion that "this accident occurred to a military plane which had gone aloft to test secret electronic equipment,” and that "there was a reasonable danger that the accident investigation report would contain references to the secret electronic equipment which was the primary concern of the mission.” 345 U.S. at 10, 73 S.Ct. 528. In 1996, however, the "secret” accident report involved in that case was declassified. A review of the report revealed, not "details of any secret project the plane was involved in,” but "[ijnstead, ... a horror story of incompetence, bungling, and tragic error.” Garry Wills, Why the Government Can Legally Lie, 56 N.Y. Rev. of Books 32, 33 (2009). Courts should be concerned to prevent a concentration of unchecked power that would permit such abuses.